ESTATE OF Maria Teresa MACIAS, Plaintiff,

v.

Deputy Sheriff Mark LOPEZ, County of Sonoma, Defendants.

No. C–96–3658 DLJ.

United States District Court, N.D. California.

March 5, 1999.

---

Richard A. Seltzer, Seltzer and Cody, Oakland, CA, Dennis Cunningham, San Francisco, CA, for Plaintiff.

Michael D. Senneff, Senneff, Kelly, Kimelman & Miller, Santa Rosa, CA, for defendants.

## ORDER

JENSEN, District Judge.

On December 23, 1998, the Court heard argument on defendants' motion for summary judgment. Michael D. Senneff appeared on behalf of defendants, and Richard A. Seltzer and Dennis Cunningham appeared on behalf of plaintiff. Having considered the arguments of counsel, the papers submitted, the applicable law and the record in this case, the Court hereby GRANTS defendants' motion.

## I. BACKGROUND

A. *Factual Background*

The deceased, Maria Teresa Macias, was shot and killed by her ex-husband Avelino Macias on April 15, 1996. Mr. Macias followed Ms. Macias to her place of employment, in the city of Sonoma, where he killed her and shot and injured her mother, Sara Hernandez, before shooting and killing himself. This action was brought by Ms. Macias's successors in interest, her minor children, who are represented by their Guardian, Sara Hernandez ("plaintiff"), who also brought suit on her own behalf for the injuries she sustained at the hands of Mr. Macias and for the wrongful death of her daughter.

Maria Teresa and Avelino Macias met in Mexico in 1980. They married in 1982 and

settled in Sonoma County. Avelino was a legal resident of the United States, Maria Teresa was not. In March of 1995, Maria Teresa took her three children to a women's shelter in Ukiah, California. There she filed a report documenting the "aggravated physical, emotional and sexual abuse of herself and her children by her husband," which report was forwarded to the Sonoma County Sheriff's Office for investigation.

On April 24, 1995, Maria Teresa filed a declaration in the Sonoma County Superior Court realleging the details of her earlier report. A temporary restraining order was issued against Avelino, and Maria Teresa was warned that if she was not able to keep Avelino away from her children, the children would be taken from her.

In May or June of 1995, despite the TRO, Avelino began residing again at Maria Teresa's home. Plaintiff alleges that Avelino "forced himself back into" the home through "mental and emotional abuse, physical intimidation and threats to report Maria Teresa to the INS." Second Amended Complaint ("SAC") ¶ 25. In June of 1995, because of Avelino's return, Sonoma County Child Protective Services removed the children from Maria Teresa's custody.

In September of 1995, Maria Teresa's mother, Sara Hernandez, who had recently moved to the United States from Mexico, assisted Maria Teresa in once again evicting Avelino from the home. However, according to the plaintiff, "Avelino's aggressions continued during the next four months, and he repeatedly stalked, threatened, and sexually assaulted Maria Teresa. Avelino also began to openly boast that he would kill Maria Teresa and her mother." *Id.* ¶ 27.

On January 22, 1996, Maria Teresa obtained a second restraining order against Avelino, based in part on his murderous threats against Maria Teresa and Sara Hernandez. Yet plaintiff maintains that Avelino was undeterred by the restraining order: "He would phone Maria Teresa, he would come to her home and force his way into the home, he would tailgate her in his vehicle, he blocked her from leaving places, he would make lurid threats to her face, and he continued to threaten to kill Maria Teresa and her mother Sara Hernandez." *Id.* ¶ 28.

Plaintiff further alleges that "[a]ll of this conduct was reported to the defendants in repeated calls and personal contacts. Maria Teresa provided sworn statements, interviews, eyewitness, and, later, a detailed, written chronology and other evidence, all documenting Avelino's crimes against her, and her helplessness and her fear." *Id.* ¶ 29. Finally, plaintiff alleges that prior to the murder "Avelino boasted to friends and others in the community that the deputy sheriffs were on his side, that the Sheriff protected him and not Maria Teresa. Avelino would torment Maria Teresa with the same gibe." *Id.* ¶ 30.

B. *Procedural History*

Plaintiff filed suit on October 9, 1996. As alleged in plaintiff's first amended complaint, defendants were the County of Sonoma, acting through its Sheriff's department, as well as Sheriff Mark Ihde and several of his deputies. Plaintiff alleged that Maria Teresa's death and Sara Hendandez's injuries were the result of a policy on the part of the Sonoma County Sheriff's department to discriminate against women, and in particular, women who are victims of gender-based violence, as well as against Latinos. Plaintiff alleged under 42 U.S.C. § 1983 that this policy deprived the deceased of her rights to due process and equal protection of law.

Defendants moved to dismiss plaintiff's first amended complaint on the ground that the complaint failed to make out either a due process or an equal protection cause of action against either the County or the individual defendants. In its Order of March 31, 1997, the Court granted in part and denied in part defendants' motion to dismiss.

The Court found that, as a matter of law, plaintiff could bring no due process

cause of action for the alleged failure of the defendants to arrest Avelino Macias. The Court concluded that it was bound by the United States Supreme Court decision in *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989), as interpreted by the Ninth Circuit in *Balistreri v. Pacifica Police Department*, 901 F.2d 696, 698 (9th Cir.1990). In *DeShaney*, the Supreme Court ruled that "nothing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors." *DeShaney*, 109 S.Ct. at 1003. The Ninth Circuit applied the *DeShaney* holding in the domestic violence context in *Balistreri*, finding that police did not violate the due process rights of a domestic violence victim by grossly mishandling her complaints of harassment and requests for protection. 901 F.2d at 700. The similarity between the police conduct alleged in *Balistreri* and the conduct alleged in this case compelled the Court to conclude that plaintiff had failed to state a due process claim upon which relief may be granted.

The Court also found in its March 31, 1997 Order that, although plaintiff had properly alleged an equal protection cause of action against Sonoma County, she had failed to meet the heightened requirements for pleading an equal protection cause of action against individual defendants. Plaintiff was given leave to amend her equal protection allegations against the individual defendants in order to establish a nonconclusory basis for her allegations that they intended to discriminate against women, victims of domestic violence and Latinos.

On April 30, 1997, plaintiff filed a second amended complaint ("SAC"), significantly streamlining her allegations. Sara Hernandez now sues only as a representative of her grandchildren. The second amended complaint drops each of the individual defendants except Deputy Sheriff Mark Lopez, the deputy who is alleged to have been most closely involved in Maria Teresa's complaints against her husband. As to Deputy Lopez, the SAC includes new allegations in order to satisfy the heightened pleading standard identified by the Court in its order of March 31, 1997.

Defendants Mark Lopez and the County of Sonoma again moved to dismiss plaintiff's complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). In an Order dated August 8, 1997, the Court granted in part and denied in part the motion. Specifically, the Court granted defendants' motion to dismiss plaintiff's allegation of discrimination against Latinos in violation of 42 U.S.C. § 1983, but denied defendants' motion to dismiss allegations of discrimination against women and victims of domestic violence.

On October 31, 1997, the Court ordered discovery in this action to proceed in phases. The first phase was to be directed solely at the issue of whether or not the conduct of the defendants in this case caused the death of Maria Teresa Macias, or any injury to Sara Hernandez or the Macias children. The Court instructed the parties that it would hear a motion for summary judgment limited to the issue of causation following the completion of discovery on this issue.

Discovery on the issue of causation has now been completed. Pursuant to the Court's order, defendants filed a motion for summary judgment on the basis of causation on November 24, 1998. This motion is currently before the Court.

## C. Legal Standard

The Federal Rules of Civil Procedure provide for summary adjudication when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(e).

In a motion for summary judgment, "[i]f the party moving for summary judgment meets its initial burden of identifying for

the court those portions of the materials on file that it believes demonstrate the absence of any genuine issues of material fact," the burden of production then shifts so that "the nonmoving party must set forth, by affidavit or as otherwise provided in Rule 56, '*specific facts* showing that there is a genuine issue for trial.'" *T.W. Elec. Service, Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir.1987) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)); *Kaiser Cement Corp. v. Fischbach & Moore, Inc.*, 793 F.2d 1100, 1103–04 (9th Cir.), *cert. denied*, 479 U.S. 949, 107 S.Ct. 435, 93 L.Ed.2d 384 (1986).

A moving party who will not have the burden of proof at trial need only point to the insufficiency of the other side's evidence, thereby shifting to the nonmoving party the burden of raising genuine issues of fact by substantial evidence. *T.W. Electric*, 809 F.2d at 630 (citing *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548); *Kaiser Cement*, 793 F.2d at 1103–04.

In judging evidence at the summary judgment stage, the Court does not make credibility determinations or weigh conflicting evidence, and draws all inferences in the light most favorable to the nonmoving party. *T.W. Electric*, 809 F.2d at 630–31 (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)) *Ting v. United States*, 927 F.2d 1504, 1509 (9th Cir.1991).

The evidence the parties present must be admissible. Fed.R.Civ.P. 56(e). Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. *See Falls Riverway Realty, Inc. v. Niagara Falls*, 754 F.2d 49 (2nd Cir.1985); *Thornhill Pub. Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir.1979). Hearsay statements found in affidavits are inadmissible. *See, e.g., Fong v. American Airlines, Inc.*, 626 F.2d 759, 762–63 (9th Cir.1980). The party who will have the burden of proof must persuade the Court

that it will have sufficient admissible evidence to justify going to trial.

The standard for judging a motion for summary judgment is the same standard used to judge a motion for a directed verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## II. DISCUSSION

In order to establish her claim under 42 U.S.C. § 1983 that defendant Mark Lopez violated Maria Teresa Macias' constitutional rights, plaintiff must show that: (1) the Maria Teresa Macias possessed a constitutional right of which she was deprived; (2) the acts or omissions of the defendant were intentional; (3) the defendant acted under color of law; and (4) the acts or omissions of the defendant caused the constitutional deprivation. *See Leer v. Murphy*, 844 F.2d 628 (9th Cir.1988); *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir.1978).

Similarly, in order to establish municipal liability under 42 U.S.C. § 1983 against the County of Sonoma for failing to act to preserve constitutional rights, the plaintiff must show that: (1) Maria Teresa Macias possessed a constitutional right of which she was deprived; (2) the municipality had a policy or custom; (3) this policy or custom amounts to deliberate indifference to the Maria Teresa Macias' constitutional right; and (4) the policy or custom caused the constitutional deprivation. *See Oviatt v. Pearce*, 954 F.2d 1470, 1474 (9th Cir.1992) (citing *City of Canton, Ohio v. Harris*, 489 U.S. 378, 386–389, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)).

At this stage in the litigation, the Court is only confronted with the sufficiency of plaintiff's showing as to the fourth element in each of plaintiff's section 1983 claims; the element of causation. *See* Order of Oct. 31, 1997. For the purposes of this Order,

therefore, the Court assumes without deciding that the other elements needed to establish a section 1983 violation exist.

## A. Causation Under 42 U.S.C. § 1983

■ Before there can be any liability under section 1983, there must be "a direct causal link" between the personal conduct of Deputy Lopez or the municipal conduct of Sonoma County and the alleged constitutional deprivation, in this case the murder of Maria Teresa Macias on April 15, 1996. *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). *See also City of Springfield, Mass. v. Kibbe*, 480 U.S. 257, 267, 107 S.Ct. 1114, 94 L.Ed.2d 293 (1987) ("The Court repeatedly has stressed the need to find a *direct causal connection* between the municipal conduct and the constitutional deprivation" (emphasis added)); *Monell v. New York Dep't of Social Serv.*, 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) ("[I]t is only when execution of a government's policy or custom … *inflicts* the injury that the government as an entity is responsible under § 1983" (emphasis added)); *Harris v. City of Roseburg*, 664 F.2d 1121, 1125 (9th Cir.1981) ("Liability under § 1983 can be established by showing that the defendant [ ] either personally participated in a deprivation of the plaintiff's rights, or caused such a deprivation to occur").

■ As under traditional tort law, this required causal link consists of two separate elements: (1) actual cause, and (2) legal cause. *See Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir.1996); *White v. Roper*, 901 F.2d 1501, 1505 (9th Cir.1990); *Arnold v. International Business Machines Corp.*, 637 F.2d 1350, 1355 (9th Cir.1981).

By using the terms "actual cause" and "legal cause" to denominate the requirements for section 1983 causation, the Court avoids the term "proximate cause." The Court does so to prevent confusion. The term "proximate cause" has been used inconsistently by courts, leaving its exact meaning unclear. Courts sometimes use the terms "proximate cause" and "legal cause" more or less interchangeably, while other times courts use the term "proximate cause" to refer to some amalgam of "actual cause" and "legal cause." *See generally Sementilli v. Trinidad Corp.*, 155 F.3d 1130, 1135 n. 1 (9th Cir.1998) (Nelson, J., specially concurring) (citing examples). Also, because of this inconsistent usage, the Court differentiates prior decisions addressing the issue of causation based upon the substance of their analysis rather than on whether and how the decision employs the term "proximate cause."

■ In order to establish actual causation, a plaintiff must first show that defendant was a "but for" cause of her injury. *See Canton*, 489 U.S. at 391; *Van Ort v. Estate of Stanewich*, 92 F.3d 831, 837 (9th Cir.1996) (requiring "but for" causation in section 1983 action). By definition, there can be no actual causation without a threshold showing of "but for" causation. *Clement v. United States*, 980 F.2d 48, 54 (1st Cir.1992) ("Causation-in-fact is, by definition, a factual inquiry which requires a court to determine if an injury would not have occurred but for a defendant's negligence. . . .").

However, the existence of "but for" causation, while necessary, is not sufficient by itself to establish actual causation. *See Shyface v. Secretary of Health and Human Services*, 165 F.3d 1344, 1351 (Fed. Cir.1999). *See also Van Ort v. Estate of Stanewich*, 92 F.3d 831, 837 (9th Cir.1996), cert. denied 519 U.S. 1111, 117 S.Ct. 950, 136 L.Ed.2d 837 (1997) ("Pointing to a municipal policy action or inaction as a 'but for' cause is not enough to prove a causal connection"); *Benefiel v. Exxon Corp.*, 959 F.2d 805, 807 (9th Cir.1992) ("[A] plaintiff must do more than merely demonstrate that 'defendant's action triggered a series of other events that led to the alleged injury'"). Rather, a plaintiff must also show that the defendant's action was a "substantial factor in bringing about [the] harm." *Benefiel*, 959 F.2d at 807 (internal quotations omitted). *See also Shyface*, 165 F.3d 1344, 1351; *Mendoza v. City of Los*

*Angeles,* 66 Cal.App.4th 1333, 1342, 78 Cal. Rptr.2d 525 (1998); Restatement (Second) of Torts § 431 cmt. a ("In order to be a legal cause of another's harm, it is not enough that the harm would not have occurred had the actor not been negligent ... The negligence must also be a substantial factor in bringing about the plaintiff's harm").

Once it has been established that plaintiff's injury would not have occurred but for the defendant's conduct, and that defendant's conduct was a substantial factor in bringing about the injury, the question still remains whether the defendant's conduct is the legal cause of the injury. Because, in theory, "the consequences of an act go forward to eternity, and the causes of an event go back to the dawn of human events, and beyond," legal causation is a necessary limitation on liability. *See Exxon Co. USA v. Sofec, Inc.,* 517 U.S. 830, 116 S.Ct. 1813, 1818, 135 L.Ed.2d 113 (1996) (quoting W. Keeton, Prosser and Keeton on the Law of Torts 263 (5th ed.1984)). Legal causation requires the existence of a sufficient causal link between the act or omission of a defendant and any injury suffered by the plaintiff to justify the imposition of liability. As the Supreme Court has explained:

> [T]he careless actor will not always be held for all damages for which the forces that he risked were a cause in fact. Somewhere a point will be reached when courts will agree that the link has become too tenuous—that what is claimed to be consequence is only fortuity.

*Id.* (internal quotations and alterations omitted). *See also Babbitt v. Sweet Home Chapter,* 515 U.S. 687, 115 S.Ct. 2407, 2420, 132 L.Ed.2d 597 (1995) (O'Connor, J., concurring) ("Proximate causation depends to a great extent on considerations of the fairness of imposing liability for remote consequences").

Legal causation frequently is equated with the concept of "foreseeability." An act or event is generally considered foreseeable if an ordinarily prudent person in the position of the defendant could reasonably have foreseen that it was likely to occur. *See, e.g., Arnold v. International Bus. Machines,* 637 F.2d 1350, 1355; *Beard v. Mitchell,* 604 F.2d 485, 496–97 (7th Cir.1979). Under most circumstances, legal causation does not extend beyond the scope of "foreseeable risks." *Sundance Land v. Community First Fed. Sav. & Loan.,* 840 F.2d 653, 663 (9th Cir. 1988). *See also Van Ort,* 92 F.3d at 837 (applying foreseeability test to question of proximate cause in section 1983 action); *Hines v. U.S.,* 60 F.3d 1442, 1450 (9th Cir.1995) ("The question of proximate cause is usually defined with reference to the scope of the foreseeable risks of the actor's conduct").

However, "foreseeability" is not the only element of legal causation. Whether or not legal causation exists may also determined by the existence of intervening or superseding actual causes. "The doctrine of superseding cause is ... applied where the defendant's negligence in fact substantially contributed to the plaintiff's injury, but the injury was actually brought about by a later cause of independent origin that was not foreseeable." *Sofec,* 116 S.Ct. at 1818 (internal quotations omitted). *See also* Restatement (Second) of Torts § 440 cmt. b (1965) ("[S]uperseding cause relieves the actor of liability, irrespective of whether his antecedent negligence was or was not a substantial factor in bringing about the harm").

The Supreme Court applied the doctrine of superseding cause in *Exxon Co. USA v. Sofec Inc.,* 517 U.S. 830, 116 S.Ct. 1813, 135 L.Ed.2d 113 (1996), a case the Court finds instructive. In *Sofec,* a storm caused the Exxon oil tanker "Houston" to break away from a "Single Point Mooring System" ("SPM") manufactured by respondent Sofec. *Id.* at 1815–16. The Houston broke away from the SPM, in part, because of the negligent manufacture of the SPM by Sofec. *Id.* As a result of the break-away, the captain of the Houston was forced to take the ship into deep water to prevent the ship's propeller from being

fouled by a loose oil hose. *Id.* After securing the hose, the captain of the Houston turned the ship shoreward without first plotting the ship's position and proceeded to strand the ship on a known reef, causing its total loss. *Id.* Exxon sued Sofec for damages stemming from the grounding of the Houston. Although the Supreme Court acknowledged that Sofec's negligence clearly was a cause in fact of the Houston running aground on the reef, the Supreme Court held that the captain's negligence was "the sole proximate cause of Exxon's injury," severing the chain of legal causation linking Sofec's negligence to Exxon's injury. *Id.* at 1817–18.

█ The doctrine of intervening or superseding cause has been applied to 42 U.S.C. § 1983 actions. The presence of such causes have been held to prevent the direct causal connection required for liability in section 1983 cases. *See Van Ort v. Estate of Stanewich,* 92 F.3d 831, 837 (9th Cir.1996) (holding that in section 1983 actions, the Ninth Circuit has looked to "[t]raditional tort law" to define "intervening causes that break the chain of proximate causation"); *White v. Roper,* 901 F.2d 1501, 1506 (9th Cir.1990) (defendant's "conduct is not the proximate cause of [plaintiff's] alleged injuries if another cause supersedes his liability for the subsequent events"); *Gutierrez–Rodriguez v. Cartagena,* 882 F.2d 553, 561 (1st Cir.1989) ("An unforeseen and abnormal intervention breaks the chain of causality, thus shielding the defendant from section 1983 liability").

█ Causation is generally for the trier of fact to resolve. Nonetheless, the issue may be decided by the Court when, although it is assumed that all the facts asserted by the plaintiff are true, actual causation cannot reasonably be established on the basis of those facts. *SeeVan Ort,* 92 F.3d at 837 (citing *Springer v. Seaman,* 821 F.2d 871, 876–77 (1st Cir.1987)); *Benefiel v. Exxon Corp.,* 959 F.2d 805, 808 (9th Cir.1992) (citing cases). The outer bounds of legal causation are also for the Court to decide. This is because the existence of legal cause "essentially depends upon whether the policy of the law will extend the responsibility for the conduct to the consequences which have in fact occurred." *Sundance Land v. Community First Federal,* 840 F.2d 653, 663 (9th Cir.1988) (internal quotations omitted). *See also Blue Shield of Virginia v. McCready,* 457 U.S. 465, 478 n. 13, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982) ("What we do mean by the word 'proximate' is, that because of convenience, of public policy, of a rough sense of justice, the law arbitrarily declines to trace a series of events beyond a certain point" (quoting *Palsgraf v. Long Island R. Co.,* 248 N.Y. 339, 351–52, 162 N.E. 99 (1928) (Andrews J., dissenting))); *Ballard v. Uribe,* 41 Cal.3d 564, 572 n. 6, 224 Cal.Rptr. 664, 715 P.2d 624 (1986).

In setting the outer bounds of legal causation, courts must examine the issue on a case-by-case basis, and in light of considerations of logic, common sense, justice, policy and precedent. *See* W. Page Keeton et al., Prosser & Keeton on the Law of Torts § 41 at 279 (5th ed.1984). *See also Sofec,* 116 S.Ct. at 1818 ("The best use that can be made of the authorities on proximate cause is merely to furnish illustrations of situations which judicious men upon careful consideration have adjudged to be on one side of the line or the other" (internal quotations omitted)).

**B. *Defendants' Showing Regarding Causation***

█ Because defendants will not have the burden of proof at trial, defendants only need to identify portions of the record that indicate an absence of any genuine issue of material fact on the issue of causation. *See T.W. Elec. Service, Inc. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 630–31 (9th Cir.1987). Defendants have succeeded in satisfying this burden. Defendants provide the Court with evidence that Sonoma County Sheriff's Department ("SCSD") deputies, including defendant Deputy Mark Lopez, on three occasions recommended to the District Attorney's

Office that Avelino Macias be prosecuted for violations of the TRO against him. Lopez Decl. ¶¶ 3–5, 11; Deffenbaugh Decl. ¶¶ 2–4.

Defendants also provide evidence indicating that none of the reports of harassment or stalking of Maria Teresa by Avelino Macias recorded by the SCSD involved acts of violence, and that Maria Teresa Macias recanted her allegations of child abuse against Avelino to the SCSD in June 1995. Duenas Decl. Defendants also point out that the last reported contact the SCSD had with either Maria Teresa or Avelino Macias was on March 18, 1996, some four weeks before Avelino's April 15, 1996 murder-suicide, and that Deputy Mark Lopez was transferred to court security duty in Santa Rosa three weeks before the murder-suicide. Def. Mo. at 5–13 and supporting evidence.

Furthermore, defendants' provide deposition testimony of the two psychologists, Dr. Borrajo and Dr. Alvarez, who had regular contact with Avelino Macias in the months and weeks prior to the murder of Maria Teresa. Both psychologists state that there were no indications Avelino was violent, homicidal or suicidal prior to the April 15, 1996 murder-suicide. Bluestone Decl., Ex. C (Borrajo Depo. at 48:2–10; 53:13–54:19); Ex. A (Alvarez Depo. at 15:91–9; 27:16–30:21).

This evidence, together with the undisputed facts that the direct cause of Maria Teresa's death was not defendants, but rather Avelino Macias, and that Maria Teresa's death took place in the city of Sonoma, outside the jurisdiction of the SCSD, is sufficient to shift the burden at summary judgment to the plaintiff to set forth by admissible evidence "specific facts showing that there is a genuine issue for trial." *T.W. Elec. Service,* 809 F.2d at 630. The Court finds that plaintiff has failed to meet this burden with regard to either actual causation or legal causation.

## C. *Plaintiff' Evidence of Causation*

### 1. *Actual cause*

Plaintiff's theory of actual causation is based on the failure of Deputy Sheriff Mark Lopez individually, and the SCSD collectively, to properly handle Maria Teresa Macias' complaints and to arrest Avelino Macias. Had defendants properly handled Maria Teresa Macias' complaints regarding Avelino, plaintiff asserts that Avelino would have been arrested on numerous occasions. Plaintiff insists that as a result of one or more arrests, Avelino more likely than not would have been in custody on April 15, 1996, the day Maria Teresa was murdered. Plaintiff also insists that even if Avelino were not in custody on April 15, 1996, the act of arresting Avelino alone likely would have deterred him from injuring his estranged wife in the future. It would have, plaintiff asserts, broken Avelino's pattern of obsessive stalking, making it less likely that the stalking would escalate to violence.

By not arresting Avelino, and by allegedly discouraging Maria Teresa from reporting additional incidents of harassment, plaintiff argues that Deputy Mark Lopez and the SCSD guaranteed that Avelino was not in custody and encouraged him to continue his harassment of Maria Teresa. Defendants failure to take appropriate action in response to Maria Teresa's complaints, under plaintiff's theory, led Avelino to believe that he was not doing anything wrong and that the defendants were on his side.

In support of their theory of causation, plaintiff provides the Court with considerable evidence that the SCSD, if not Deputy Mark Lopez individually, knew or should have known that Avelino's stalking and harassment of Maria Teresa was more pervasive and more serious than that conceded by defendants. In addition to the contacts documented in SCSD records, plaintiff provides deposition testimony from two witnesses stating that they called the SCSD at least eight times on Maria

Teresa's behalf. Seltzer Decl., Ex. B (Armstrong Depo. 116:3–117:7); Ex. D (Cabello Depo. 165:3–8). There is also a transcript of a 911 call made by Maria Teresa in which the operator asks Maria Teresa if Avelino had ever been violent toward her, and she responds "Mucho." *Id.* Ex. AA.

Plaintiff provides testimony that Maria Teresa visited the SCSD substation on four occasions and flagged down SCSD patrol cars on at least two occasions to report Avelino's stalking and harassment. Pl. Opp. at 9 and supporting evidence. Marty Cabello, who is described by plaintiff as a friend of both Maria Teresa and Avelino, states in her deposition that Maria Teresa told Deputy Deffenbaugh on one of her visits to the SCSD substation that Avelino was threatening to kill her. Seltzer Decl. Ex. D (Cabello Depo. 222:5–25; 233:19–24). According to Cabello, she and Maria Teresa were at the substation explaining Maria Teresa's situation for two hours. *Id.*

Plaintiff also submits evidence which disputes the SCSD's assertion that the department was unaware of the one-year restraining order against Avelino Macias, which was issued by Judge John Gallagher of the Sonoma County Superior Court on February 15, 1998. Cabello states in her deposition that on February 22, she and Maria Teresa obtained a copy of the minute order reflecting Judge Gallagher's imposition of the restraining order and delivered it to the SCSD substation the same day. *Id.*, Ex. D (Cabello Decl. 244:3–245:3; 246:13–19); Ex. Q (Perez Depo., Ex. 1).

Furthermore, plaintiff provides deposition testimony that numerous other government officials who had contact with Maria Teresa, as well as her friends and employers, knew of Avelino's stalking and harassment. *See, e.g., id.,* Ex. L (Levi Depo. 50:25–60:25); Ex. G (Palacios–Flaherty Depo. 25:22–16:17); Ex. H (Galindo Depo. 31:7–13); Ex. × (Taboas Depo. 16:15–21). Apparently, the inference to be drawn from this evidence is that if all these people knew of Avelino's stalking and threats, the defendants should have known as well.

In addition to evidence regarding notice to defendants of Avelino Macias' conduct, plaintiff has submitted evidence indicating that defendants were required by state law and by SCSD department policy to take certain actions in response to Maria Teresa's complaints about Avelino, but that Deputy Lpoez and the SCSD did not take these actions. The actions defendants allegedly should have taken include filing detailed reports about Avelino's conduct, and possibly arresting Avelino and taking him into custody.

In her declaration, plaintiff's expert witness Anne O'Dell, a retired San Diego police detective and domestic violence researcher, analyzes each documented contact between Maria Teresa and the SCSD. She concludes that in each instance the SCSD deputies failed to abide by numerous provisions of the then existing California Penal Code and SCSD Department orders regarding the handling of domestic violence incidents. O'Dell Decl. ¶ 3. Three of these documented contacts involved individual defendant Mark Lopez. O'Dell analyzes the contacts Deputy Lopez had with Maria Teresa Macias and concludes that his performance in each case was deficient. Under plaintiff's theory, Deputy Lopez's failure to handle properly each of these instances caused Maria Teresa Macias' death.

Deputy Lopez's first involvement with Maria Teresa Macias took place on January 31, 1996. Deputy Lopez was dispatched to Maria Teresa Macias' apartment in response to a 911 call reporting a temporary restraining order violation by Avelino Macias. Avelino had left the scene by the time Deputy Lopez arrived. Deputy Lopez called Avelino and warned him not violate the TRO again, and then filed an incident report with the District Attorney's Office recommending Avelino be charged with violating the TRO. The Dis-

trict Attorney did not file any charges based on this report.

In her declaration, O'Dell attacks Deputy Lopez's handling of this incident on several grounds. Specifically, she criticizes Deputy Lopez for spending only twenty-one minutes handling the call, for not conducting a thorough investigation of the incident, as required by SCSD policy, for not filing a more complete report with the District Attorney's Office, and for not informing Maria Teresa of her right to make a citizen's arrest in the case of future TRO violations by Avelino. O'Dell Decl. ¶ 3(e). O'Dell also insists that, based on the information contained in the TRO, of which she asserts Deputy Lopez must have been aware, Deputy Lopez was required to seek out and arrest Avelino Macias for felony stalking. *Id.*

Deputy Lopez's other two documented contacts with Maria Teresa Macias took place on February 23, 1999. First, around 7:00 PM on February 23, Maria Teresa visited the Sheriff's Sonoma Valley substation for the second time in three days to report incidents of harassment and stalking by Avelino. Deputy Lopez prepared a report regarding her complaints. *Id.* ¶ 3(g); Lopez Decl. ¶¶ 7–11. Later that same evening, around 11:00 PM, Maria Teresa called the SCSD to report that Avelino had called her again. Deputy Lopez was contacted by the SCSD dispatcher regarding Maria Teresa's call. Deputy Lopez, who, according to defendants, was in the process of responding to a burglary call, expressed frustration over that fact that Maria Teresa was calling again and told the dispatcher that he had just spoken to Maria Teresa and that he would respond to her call later. O'Dell Decl. ¶ 3(h). Deputy Lopez visited Maria Teresa's apartment later that night and then called Avelino and told him that witness were corroborating Maria Teresa's story and that it would be in his interest to stay away from Maria Teresa. *Id.* ¶ 3(g); Lopez Decl. ¶ 8–9. The next day, Deputy Lopez submitted a supplemental report, cross-referenced to his January 31, 1996 report, to the District Attorney's Office.

This report was not reviewed by a district attorney before Maria Teresa was killed on April 15, 1996. McMahon Decl. ¶ 6; Rolen Decl. ¶ 8.

O'Dell contends that Deputy Lopez also handled both of these contacts improperly. O'Dell asserts that it was unprofessional of Deputy Lopez to call Avelino and to provide him with any kind of warning. O'Dell Decl. ¶ 3(g). According to O'Dell, Deputy Lopez's conduct amounts to "aiding and abetting" Avelino's stalking and harassment. *Id.* In addition, while acknowledging that Deputy Lopez filed a report with the District Attorney's Office recommending that Avelino be prosecuted, O'Dell states that Deputy Lopez was required to take additional steps to "institute action to arrest Avelino for felony stalking." *Id.*

Beyond their evidence that defendants mishandled the complaints they received regarding Avelino Macias, plaintiff provides the Court with evidence that defendants discouraged Maria Teresa and her friends and supporters from making additional reports of stalking and harassment by Avelino to the SCSD. There is deposition testimony from Marty Cabello that the unnamed Sheriff's deputies told her not to call every time Avelino makes an appearance, but rather just to write down the incidents and drop off a report at the substation. Seltzer Decl., Ex. D (Cabello Depo. 614:16–616:11–15; 337:12–23). Plaintiff argues that Cabello's testimony is corroborated by the fact that tape recordings of some of Avelino's threatening phone calls and other documentary evidence of his harassment were found among Maria Teresa's possessions after the murder.

Finally, plaintiff provides deposition testimony suggesting that defendants' acts and omissions served to encourage Avelino Macias's stalking and harassment. Soledad Macias states that Avelino told her he believed the sheriffs were "on his side," Seltzer Decl., Ex. N (Soledad Macias Depo. at 20:27–21:2), and Marty Cabello

declares that Avelino boasted that every time the sheriffs were called, they "didn't do anything to him." *Id.*, Ex. D (Cabello Depo. at 162:22–163:8). Similarly, Ana Palacios Flaherty states in her deposition that Avelino said that if he were doing anything wrong he would be in jail. Pl.'s Evid. Supp., Ex. A.

Defendants dispute the admissibility of much of this evidence. Defendants argue that the declarations and deposition testimony relied upon by plaintiff are replete with inadmissible hearsay statements. *See generally* Def. Objections to Pl's Evid. 1–6. Plaintiff responds by arguing that many of the statements objected to by defendants are not hearsay at all, but rather are offered to show notice to the defendants. Plaintiff also asserts that those statements which are hearsay are admissible under exceptions the hearsay rule. The Court agrees with defendants that the admissibility at trial of many of the statements plaintiff relies upon is questionable. However, the Court's disposition of defendants' motion does not hinge on whether or not plaintiff's evidence is excluded by the hearsay rule or falls within one of its exceptions. Even if the Court assumes that all of plaintiff's evidence is admissible and true, the Court still finds that plaintiff has failed to make the showing necessary to survive summary judgment.

First, the Court notes that much of the evidence introduced by plaintiff is plainly inapplicable to individual defendant Mark Lopez. Unlike the County of Sonoma, which is liable for any acts taken by its agents pursuant to an unconstitutional municipal policy or custom, Deputy Lopez can only be held liable for harm caused by his own acts and omissions. *See Leer v. Murphy*, 844 F.2d 628, 633 (9th Cir.1988) While Deputy Lopez may have had a greater involvement than anyone else at the SCSD with Maria Teresa and Avelino Macias, he clearly was not involved in most of the incidents upon which plaintiff relies.

Deputy Lopez was not involved in the initial January 21, 1996 contact between the SCSD and Maria Teresa. Rather it was Deputy O'Bryan who responded to Maria Teresa's request for assistance. Deputy Lopez also was not involved in the SCSD's failure to find the Glen Ellen residence where Maria Teresa worked and where Avelino had appeared and made a threat on January 22, 1996. It was Deputy Hansen who was dispatched to answer this call. Nor was Deputy Lopez involved in responding to Marty Cabello's call to report that Avelino was at Maria Teresa's apartment and had blocked her car into the driveway. Deputies Mullnix and O'Bryan responded on this occasion. Indeed, there are only three documented contacts between Deputy Lopez and Maria Teresa Macias over a nearly four week period.

More importantly, with regard to both Deputy Lopez and the SCSD, plaintiff's evidence of notice to defendants of Avelino's conduct, and defendants' failure to intervene, only goes toward establishing that defendants breached their duty, assuming they had such a duty, to Maria Teresa Macias. However, the issue currently before the Court is causation, not duty or breach. Plaintiff's evidence does not establish any "direct causal link" between defendants' alleged breach of duty and Avelino Macias' murder of Maria Teresa on April 15, 1998. The evidence does not show that "but for" defendants' failure to take actions they could have and legally should have taken, serious injury to Maria Teresa would have been averted. Furthermore, even if defendants' acts and omissions were a "but for" cause, plaintiff's evidence does not establish that defendants' conduct was a "substantial factor" in causing Maria Teresa's death.

Because of these shortcomings, plaintiff necessarily relies upon the opinion testimony of expert witnesses to bridge the causal gap between defendants' conduct and Maria Teresa's death. Plaintiff's experts, former San Diego police detective Anne O'Dell and Dr. Daniel J. Sonkin, a family counselor who specializes in domestic violence and child abuse, both conclude in

their declarations that defendants acted wrongfully in handling the Macias case, and that their conduct was a "substantial factor" in causing in Maria Teresa's death.

As discussed above, O'Dell examines in her declaration all of the documented contacts between the defendants and Maria Teresa and Avelino Macias and concludes that the defendants breached their duty of care in each instance. O'Dell Decl. ¶ 3. O'Dell also summarizes in her declaration four different studies showing that aggressive law enforcement and judicial intervention in domestic violence cases significantly reduces numbers of domestic homicides. *Id.* She recites, although without citation or information regarding methodology, the results of a studies in Quincy, Massachusetts, Nashville, Tennessee, San Diego, California and Washington State, all of which documented significant reductions in domestic homicides (reductions of between 40% and 80%) following the institution of aggressive intervention policies. *Id.*

Based on these studies and on her review of the defendants' conduct in dealing with Maria Teresa and Avelino Macias, O'Dell concludes that the defendants acts and omissions were:

> a substantial factor in causing Avelino to continue and escalate his illegal behavior to the point where it was entirely foreseeable that Maria Teresa was in significant danger and that she was absolutely at risk of suffering physical violence at the hands of Avelino Macias.

O'Dell Decl. ¶ 6. Specifically, O'Dell states that by mishandling Maria Teresa's complaints, and by discouraging her from reporting Avelino's conduct, defendants sent a powerful message to both her and Avelino that she was not protected and that Avelino could do what he wanted. *Id.* O'Dell also states that had defendants followed state law and SCSD department policy, they "would have arrested Avelino Macias on numerous occasions. As a result, more likely than not, he would have been in jail, or on probation and in some form of intensive treatment program long

before Maria Teresa was murdered on April 15, 1996." *Id.* ¶ 6.

Dr. Sonkin reaches similar conclusions. Sonkin declares that, based on "my expertise and experience with men like Avelino Macias," it was reasonably foreseeable from January 21, 1996 onward that if Avelino was permitted to continue his pattern of harassment, it would escalate to violence. Sonkin Decl. ¶ 3. Like O'Dell, Dr. Sonkin also alludes to the studies demonstrating that aggressive law enforcement intervention reduces domestic homicide rates. Sonkin Decl. ¶ 8. In an effort to connect the results of these studies to the specific case of Avelino Macias, Sonkin states:

> Based on my review of psychological reports on Avelino Macias, evidence of his conduct and statements reflecting his state of mind, and also my experience in working with domestic violence perpetrators, it is my opinion that Mr. Macias fits the profile of obsessive domestic violence perpetrators who stalk their partners. These individuals usually respond positively to effective law enforcement intervention.

*Id.* ¶ 12. Sonkin further states that by not intervening, and by discouraging Maria Teresa from reporting instances of stalking and harassment, defendants emboldened Avelino and convinced him that he would not receive any punishment for his conduct or any counseling. *Id.* ¶¶ 14–19. Defendants, according to Sonkin, therefore were a substantial factor in causing Maria Teresa's death. *Id.* ¶ 20.

■ Defendants contest the admissibility of these expert opinions. *See* Def. Objections to Pl.'s Evid. at 6–15. A court must consider admissible expert testimony in determining whether to grant summary judgment. *See Maffei v. Northern Ins. Co. of New York,* 12 F.3d 892, 897 (9th Cir.1993). Several evidentiary requirements must be met in order for an expert's testimony to be admissible. First, the testimony must be such that it "will assist the trier of fact to understand the evidence or

to determine a fact in issue." Fed.R.Evid. 702. In determining whether expert testimony is admissible under Rule 702, the court must keep in mind the Rule's "broad parameters of reliability, relevancy, and assistance to the trier of fact." *Desrosiers v. Flight Int'l of Fla.*, 156 F.3d 952, 960–61 (9th Cir.1998). For instance, an expert may offer an opinion as to an ultimate issue to be decided by the trier of fact. Fed.R.Evid. 704(a); *Maffei*, 12 F.3d at 897.

Next, the expert's testimony must have a proper foundation. However, Federal Rule of Evidence 703 allows an expert to base his or her opinions and inferences on facts or data "perceived by or made known to the expert at or before the hearing." Fed.R.Evid. 703. Under this rule of evidence, experts are also permitted to rely on evidence that would not otherwise be admissible in forming their opinions, provided that the evidence is of the type normally relied upon by experts in the field. *Id.* The Supreme Court·has recognized that, unlike ordinary witnesses, "an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

■■■ If an expert's testimony relates to "scientific knowledge," additional requirements apply. The court is required to make "a preliminary assessment of whether the reasoning an methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592–93, 113 S.Ct. 2786. Not all testimony from experts constitutes "scientific" testimony. When an expert's testimony is based on the expert's training and experience the requirements of *Daubert* do not apply. *See United States v. Plunk*, 153 F.3d 1011, 1017·(9th Cir.1998); *McKendall v. Crown Control Corp.*, 122 F.3d 803, 807–808·(9th Cir.1997).

■■■ Given the permissive nature of the rules regarding the admissibility of expert testimony based on experience and training, the Court finds that those parts of O'Dell's and Sonkin's declarations dealing with police practice and procedure and the effectiveness generally of domestic violence intervention and counseling are admissible. There does not appear to be any question that both O'Dell and Sonkin qualify as experts in their fields by virtue of their "knowledge, skill, experience, training, or education." Nor does there appear to be any question that O'Dell and Sonkin's testimony, if otherwise admissible, is on a topic "beyond the ken of the average juror" and therefore a proper subject of expert opinion. *Plunk*, 153 F.3d at 1017. *See also United States v. Espinosa*, 827 F.2d 604 (9th Cir.1987) ("Law enforcement officers with sufficient qualifications may testify concerning the methods and techniques employed in an area of criminal activity").

The admissibility of O'Dell and Sonkin's conclusions regarding the effect of law enforcement intervention in the specific case of Avelino Macias is a different matter. "Rule 702 demands that expert testimony relate to scientific, technical or other specialized knowledge, which does not include unsubstantiated speculation and subjective beliefs." *Diviero v. Uniroyal Goodrich Tire Co.*, 114 F.3d 851, 853 (9th Cir.1997). As the Supreme Court has recently made clear, nothing in the Federal Rules of Evidence "requires a district court to admit opinion evidence which is connected to existing data only by the ipse dixit of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *General Electric, Co. v. Joiner*, 522 U.S. 136, 118 S.Ct. 512, 519, 139 L.Ed.2d 508 (1997).

It is the opinion of the Court that, to the extent plaintiff's experts testify to the existence of a direct link between defendants' acts and omissions and the death of Maria Teresa Macias on April 15, 1996, their

testimony is pure speculation. As discussed above, the experts rely to a great extent on studies allegedly indicating that aggressive enforcement of TROs and other types of intervention in domestic violence cases reduces the number of domestic homicides. At most, these studies show that intervention works in many, but not all cases. The studies do not demonstrate that intervention in the particular case of Avelino and Maria Teresa Macias would have deterred Avelino from violence. Indeed, there is evidence in the record that Avelino had previously responded negatively to threats of intervention by the authorities. Avelino threatened to kill Maria Teresa because she had made accusations against him to the authorities, Bluestone Decl., Ex. K (S. Macias Depo. at 17:1–20:25; 35:10–17), and he threatened to kill Deputy Lopez. Ex. H (Carmona Depo., 265: 20–266: 7).

Plaintiff's experts also claim to rely on their experience gained from working on numerous domestic violence cases. For example, O'Dell claims to have worked on seventy thousand domestic violence cases. O'Dell Decl. ¶ 1. Based on their experience, both experts conclude that intervention would have been effective in the case of Avelino Macias. O'Dell states that, under the facts of this case, Avelino likely would have been in prison, on probation, or in counseling in April, and therefore unable or unwilling to harm Maria Teresa, if the defendants had arrested him January, February or March. Although he has had no personal contact with Macias, Sonkin concludes from his experience, and apparently from his "profile" assessment, that Avelino was someone who likely would have been responsive to counseling and treatment. No matter how much general knowledge and experience plaintiff's experts possess as to the practices of police and psychologists in this area, these conclusions regarding the specific state of mind of Avelino Macias simply are too speculative to establish actual causation.

Even assuming plaintiff's experts are correct that steps could have been taken that would have significantly reduced the likelihood of violence in this particular case, not all of these steps were within defendants' power. To the contrary, multiple intervening actors and circumstances stood between defendants' acts and omissions and all of the various types of intervention plaintiff alleges would have prevented the April 15, 1996 murder-suicide. Whether Avelino in fact would have been prosecuted for stalking and harassment, convicted of the charges brought, sentenced to jail, incarcerated, or enrolled in a counseling program if he had been arrested by defendants is entirely dependent upon discretionary decisions by other government agencies, including the District Attorney's Office, the Courts, and the Probation Department. Because the actions of these other agencies can only be guessed at, it cannot be said that "but for" defendants' failure to act, Avelino Macias would have been in custody or in treatment on April 15, 1996, or that any intervention would have specifically deterred Avelino from his decision to murder Maria Teresa.

The only action that can be argued was wholly within the power of defendants was arresting Avelino. Plaintiff argues that arresting Avelino, by itself, "would have been sufficient interventions to break Mr. Macias' pattern of conduct." Pl.Opp. at 36 (quoting Sonkin Decl. ¶ 6). Other than the opinion of Dr. Sonkin, however, plaintiff offers no evidence in support of this conclusion. The studies cited by Anne O'Dell all appear to involve comprehensive intervention programs that necessarily involve other agencies. O'Dell Decl. ¶ 8 (stating that the studies demonstrate that the key to deterring and reducing domestic violence homicides "is aggressive investigations and arrests by responding law enforcement as well as coordination with other parts of the judicial system"). Sonkin's speculation alone does not create a triable issue of fact. At its farthest reach, Sonkin's declaration establishes that arresting Avelino possibly could have altered his pattern of behavior. However, a mere possibility cannot establish the direct caus-

al link that is required in a section 1983 action. *See City of Canton, Ohio v. Harris,* 489 U.S. 378, 385, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989).

In concluding that plaintiff's evidence of actual causation is insufficient to survive summary judgment, the Court finds two Court of Appeals decisions to be particularly instructive: the Eighth Circuit's decision in *Ricketts v. City of Columbia Missouri,* 36 F.3d 775 (8th Cir.1994), and the First Circuit's decision in *Rodriguez–Cirilo v. Garcia,* 115 F.3d 50 (1st Cir.1997). Both cases involve section 1983 actions brought against police agencies for failing to intervene under circumstance roughly analogous to those in the instant case.[1] In both cases the courts found there was no causation as a matter of law.

In *Ricketts* an estranged husband sexually assaulted and murdered his wife's mother. The wife and her father brought a section 1983 action against the police, alleging the city had a discriminatory custom of treating domestic abuse cases less seriously than others. In the weeks prior to the murder, the plaintiff had obtained a TRO against the husband and had reported his harassment on a number of occasions to the police, but the police never arrested the husband. The Eighth Circuit, however, rejected the argument that this failure to arrest caused plaintiff' injuries. In so holding, the court reasoned:

> [T]o find that the injuries caused by Sunny's violent acts of sexual assault and murder would have been avoided had Sunny been arrested for the prior harassment would be an excess in pure speculation. Such speculation cannot establish causation because it is equally plausible that an arrest for the prior harassment might as easily have

spawned retaliatory violence from Sunny.

*Id.* at 780.

In *Rodriguez–Cirilo,* the plaintiffs sued police officers for causing the stabbing of Celso Rodriguez–Cirilo by his mentally ill and reportedly violent brother Francisco. Plaintiffs alleged that the failure of police to arrest Francisco pursuant to a mandatory temporary detention order the family had obtained caused Celso to be stabbed by Francisco two weeks later. To establish causation, the plaintiffs in *Rodriguez–Cirilo* relied upon the declaration of a psychologist stating that had Francisco been detained when police had a duty to detain him, he would have received effective treatment which would have prevented the stabbing.

The First Circuit rejected plaintiffs' causation argument, reasoning that, "even if Francisco had been taken to a hospital on March 14, 1994, for examination, appellants have not shown that an examination performed on that day would have prevented a violent attack, spurred by an argument on April 6, 199[4]." *Id.* at 53. The court stated that the declaration of the psychologist did not constitute competent evidence of causation. *Id.* "[T]he psychologists broad assertion regarding causation does not create a triable issue in this case, where the defendant's case as to a lack of proximate causation is strong." *Id.* at 53.

The decisions in *Ricketts* and *Rodriguez–Cirilo* make clear that a mere possibility police officers could have prevented a third party's act of violence does not create the direct causal link that is required to establish liability under 42 U.S.C. § 1983. And although there is no equally analogous Ninth Circuit decision,

---

1. Plaintiff argues that these cases are factually and legally distinguishable from the present case. Plaintiff contends that *Ricketts* is distinguishable on California state law grounds, while *Rodriguez–Cirilo* is distinguishable because it was brought under a due process theory and only involved only one contact between police and the plaintiffs prior to the violence the police were alleged to have caused. However, plaintiff's arguments only address the relevance of these decisions to the question of legal cause. None of plaintiff's arguments render these decisions irrelevant as to the question of actual cause.

the reasoning employed in *Ricketts* and *Rodriguez–Cirilo* is in keeping with Ninth Circuit case law on the issue of indirect causation. *See Huffman v. County of Los Angeles,* 147 F.3d 1054 (9th Cir.1998); *Van Ort v. Estate of Stanewich,* 92 F.3d 831, 837 (9th Cir.1996).

### 2. *Legal Causation*

Because plaintiff has failed to establish that defendants' were an actual cause of Maria Teresa Macias' death, it is not necessary for the Court to address the question of legal cause. However, even if plaintiff had succeeded in establishing actual causation, the Court concludes as a matter of law that defendants' were not a legal cause of Maria Teresa's death.

In making her case for the existence of legal causation, plaintiff focuses on the foreseeability of Avelino Macias' violent act. Plaintiff directs the Court to the evidence in the record indicating defendants knew or should have known that Avelino's harassment and stalking of Maria Teresa was more frequent and serious than they admit to knowing. Plaintiff asserts that given this knowledge of Avelino's behavior, it should have been reasonably foreseeable to defendants that their failure to take affirmative steps to stop Avelino's conduct eventually would result in Avelino committing an act of violence against his wife. Plaintiff also relies on the opinions of her experts. Both of plaintiff's experts declare that it is entirely foreseeable for individuals with behavior patterns such as Avelino's to eventually resort to violence. O'Dell Decl. ¶ 6; Sonkin Decl. ¶ 3–4.

However, foreseeability is not the only aspect of legal causation at issue in this case. Plaintiff's argument fails to take into account the existence in this case of actual superseding cause for Maria Teresa Macias' death. Such cause acts to break the legal chain of causation, even if Maria Teresa's death was theoretically foreseeable.

The length of time between defendants last contact with Avelino and the April 15, 1996 murder-suicide by itself constitutes a superseding cause arguably sufficient to break the chain of causation:

> "Experience has shown that when a great length of time has elapsed between the actor's negligence and harm to another, a great number of contributing factors may have operated, many of which may be difficult or impossible of actual proof. . . . [T]he effect of the actor's conduct may thus be so attenuated as to be insignificant".

Restatement (Second) of Torts § 433 cmt. f. (cited in *Rodriguez–Cirilo v. Garcia,* 115 F.3d 50, 52 (1st Cir.1997)). *See also Martinez v. California,* 444 U.S. 277, 285, 100 S.Ct. 553, 62 L.Ed.2d 481 (1980) (parolee's murder of decedent was "too remote a consequence of the parole officers' action to hold them responsible under [section 1983]"); *Ricketts,* 36 F.3d at 780 (holding that "the prior reported incidents of harassment were too remote in time to constitute a proximate cause of the violent attack"). Avelino Macias' killed himself and Maria Teresa twenty-eight days after the last reported contact between either Avelino or Maria Teresa and any representative of the SCSD. Deputy Lopez's last contact with either Avelino or Maria Teresa appears to have taken place even earlier, at the end of February, and Deputy Lopez was transferred to court security duty in Santa Rosa on March 26, three weeks before the murder-suicide.

There is evidence in the record that during this nearly month-long interval between defendants' last reported contact with Avelino and Maria Teresa Macias and the April 15 murder-suicide, Avelino's mental and emotional state deteriorated significantly. Avelino reportedly was acting "crazy" and like a "zombie," and there is testimony that he was abusing drugs and alcohol more seriously than previously. *See, e.g.,* Bluestone Decl., Ex. M (Cabello Depo at 428:25–430:24; 399:25–403:12), Ex. H (Carmona Depo. at 86:7–89:5; 112:1–115:9; 116:25–120:5). There is also evidence that Avelino Macias was selling his possessions, and that he purchased a gun in the days prior to the murder-suicide. *Id.,* Ex. H at 115:10–17.

If one accepts plaintiff's failure to arrest theory of causation, another superseding cause of Maria Teresa Macias' death was the failure of Santa Rosa Police Officer Perez to arrest Avelino after Avelino had followed Maria Teresa and her mother to an appointment with Dr. Alvarez on March 27, 1996. Bluestone Decl., Ex. G (Perez Depo. at 12:2–16). Officer Perez states that he had probable cause to have Avelino arrested, but that Maria Teresa, apparently at the urging of her social worker, Suni Levi, indicated that she simply wanted a report of the TRO violation sent to the District Attorney. Id. at 9:6–10:5; 12:25–13:23. The report, however, was never forwarded. Id. Under plaintiff's theory of causation, both Suni Levi, by convincing Maria Teresa not to have Avelino arrested, and Officer Perez and the Santa Rosa police, by failing to follow up on this incident, qualify as actual causes of Maria Teresa's death.

With regard to defendant Deputy Lopez, the failure of the other Sonoma County Sheriff's deputies who had contact with Maria Teresa Macias to act appropriately and to arrest Avelino similarly could qualify as superseding actual causes under plaintiff's theory of causation. Also, the failure of the Sonoma County District Attorney's Office to review and act upon Deputy Lopez's reports regarding Avelino Macias could be deemed an actual cause. If these actors had intervened in the case of Maria Teresa and Avelino Macias when they had the opportunity, Avelino Macias would have been arrested regardless of any conduct on the part of Deputy Lopez.

Other potential superseding causes include the meeting on April 10, 1996 between Suni Levi, Dr. Alvarez, and Maria Teresa and Avelino Macias, and Maria Teresa's act of sending a "love letter" to Enrique Carmona at time when Avelino was staying with him, which Avelino obtained. Bluestone Decl., Ex. H (Carmona Depo. 121:16–125:21). Either the meeting with Maria Teresa and the social workers or the letter could have upset Avelino sufficiently to negate whatever benefits earlier interventions by defendants could have produced. There is evidence that both events did in fact upset Avelino. Id., Ex. C (Borrajo Depo. 53:13–54:23); Ex. H. (Carmona Depo. 145:1–147:22).

At the April 10 meeting, Maria Teresa told Avelino that she did not intend to reconcile with him, and Suni Levi stated that she would recommend awarding Maria Teresa custody of their children. The day after the meeting, Soledad Macias, Avelino's cousin, states that Avelino called and told her that he was going to kill Maria Teresa. Id., Ex. K (S. Macias Depo. 9:23–10:4). Moreover, Maria Teresa's letter was found in Avelino's possession at the crime scene on April 15, 1996. Id. Ex. J (Burton Depo.). If the failure to intervene thesis is followed, based on the record before the Court, neither of these events can be ruled out as actual superseding causes of Maria Teresa's death. At the end, of course, the direct and final superseding cause is the fact that Avelino Macias killed Maria Teresa Macias.

The existence of so many potential superseding causes is indicative of why plaintiff's theory of causation cannot support a finding legal liability under 42 U.S.C. § 1983. Applying plaintiff's theory of causation to the record in this case yields an unbounded number of individuals and organizations who could be deemed actual causes of Maria Teresa Macias' death. Anyone who could have, but did not, take an action that might have altered Avelino Macias' mental state and course of conduct qualifies as a cause to plaintiff's reasoning. Indeed, if Avelino had been arrested and prosecuted, but not sentenced to jail time, under plaintiff's thesis, the presiding judge in the case could be considered a cause of Maria Teresa's death, were it not for the policy of judicial immunity.[2] To find legal

2. The Court notes that this policy is a salient application of legal causation. Although the Court does not believe that actual cause would exist in this situation, it is theoretically possible to construct a case where a judicial decision can be said to actually cause a death, but it is also clear that overarching public

liability on the basis advanced by plaintiff would, in practical effect, eliminate any meaningful limitation on the element of causation, not only in section 1983 actions, but in any civil tort action based on homicide.

In making this observation, the Court reiterates that legal causation is, ultimately, a matter of public policy. Finding legal causation in this case would have dramatic, undesirable public policy repercussions. A determination that defendants in this case legally caused Maria Teresa's death "would open municipalities to unprecedented liability under section 1983." *Canton v. Harris,* 489 U.S. 378, 391, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989); *Ricketts,* 36 F.3d at 780. Moreover, "[h]olding that an officer's failure to arrest for one incident of harassment *causes* a subsequent incident of harassment or violence would essentially take away the officer's discretion to determine when to arrest—a fundamental part of our criminal system." *Ricketts,* 36 F.3d at 780 (citing *McCleskey v. Kemp,* 481 U.S. 279, 297, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987)). These potential consequences overwhelmingly argue against any finding of legal causation in this case, regardless of whether or not Maria Teresa's death could be posited as a foreseeable consequence of defendants' conduct. "When a statute reaches action taken by governmental officials, courts must always be concerned about the law's potentially chilling effect on official conduct." *Bisbee v. Bey,* 39 F.3d 1096, 1101 (10th Cir.1994). *See also Brandon v. Lotter,* 157 F.3d 537, 540 (8th Cir.1998) ("We recognize the caution that federal courts must exercise in reviewing the highly discretionary decisions that law enforcement are called upon to make, particularly in the area of arrests"). It is difficult to imagine a potentially greater chilling effect on police conduct than a legal decision that a failure to arrest renders an officer civilly liable for murder.

policy considerations would preclude liability

## III. CONCLUSION

Because the Court finds that the plaintiff has not met her burden of proof to show the defendants were the actual cause of the death of Maria Teresa Macias, and because the Court concludes that the defendants are not the legal cause of Maria Teresa Macias' death, the Court hereby GRANTS defendants' motion for summary judgment.

IT IS SO ORDERED.