CITY OF SPRINGFIELD, MASSACHUSETTS *v.* KIBBE,
ADMINISTRATRIX OF THE ESTATE OF THURSTON

No. 85–1217.   Argued November 4, 1986—Decided February 25, 1987

*Edward M. Pikula* argued the cause for petitioner.   With
him on the briefs were *Richard T. Egan* and *Harry P.
Carroll.*

*Terry Scott Nagel* argued the cause for respondent. With him on the brief were *J. Levonne Chambers* and *Eric Schnapper.* *

PER CURIAM.

We granted certiorari to resolve the question whether consistently with our decision in *Monell* v. *New York City Dept. of Social Services,* 436 U. S. 658 (1978), a municipality can be held liable under 42 U. S. C. § 1983 for inadequate training of its employees.† 475 U. S. 1064 (1986). In addressing that issue, we anticipated that we would be able to reach the "fairly included" related question, see this Court's Rule 21.1(a), whether more than *negligence* in training is required in order to establish such liability.

The case having now been fully briefed and orally argued, we conclude that we cannot reach the negligence question. Although petitioner city of Springfield argues here that a heightened negligence standard does not suffice under *Monell*'s requirement of a municipal policy, it appears that in the District Court petitioner did not object to the jury instruction stating that gross negligence would suffice, App. 234–235, and indeed proposed its own instruction to the same effect. *Id.,* at 28. Nor did it argue for a higher standard than gross negligence in the Court of Appeals. Brief for Defendant-Appellant and Reply Brief for Defendant-Appellant in No. 85–1078 (CA1). It has informed us of no

---

*Benna Ruth Solomon* and *David O. Stewart* filed a brief for the U. S. Conference of Mayors as *amicus curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed for the American Civil Liberties Union et al. by *Marjorie Heins, Jack D. Novik, Howard Friedman, Michael Avery,* and *David Rudovsky;* and for the National Association for the Advancement of Colored People by *Grover G. Hankins.*

†We also granted certiorari on two other questions: whether the "single incident" rule of *Oklahoma City* v. *Tuttle,* 471 U. S. 808 (1985), is limited in application to one act by one officer, and whether a policy of inadequate training may be inferred from the conduct of several police officers during a single incident absent evidence of prior misconduct in the department or a conscious decision by policymakers.

special circumstances explaining its failure to preserve this question.

We ordinarily will not decide questions not raised or litigated in the lower courts. See *California* v. *Taylor*, 353 U. S. 553, 556, n. 2 (1957). That rule has special force where the party seeking to argue the issue has failed to object to a jury instruction, since Rule 51 of the Federal Rules of Civil Procedure provides that "[n]o party may assign as error the giving . . . [of] an instruction unless he objects thereto before the jury retires to consider its verdict." Here, our inability to reach the negligence issue makes this case an inappropriate vehicle for resolving the inadequate training question, because of the close interrelationship between the two matters, and the other questions presented are not of sufficient importance to warrant our review independently.

The dissent argues that we need not concern ourselves about Springfield's failure to preserve this issue, because it was passed on by the Court of Appeals below. *Post*, at 263–266. There is doubtless no jurisdictional bar to our reaching it, whether or not the Court of Appeals did so. See *Carlson* v. *Green*, 446 U. S. 14, 17, n. 2 (1980). We think, however, that there would be considerable prudential objection to reversing a judgment because of instructions that petitioner accepted, and indeed itself requested. That the Court of Appeals was fortunate enough to entertain the issue without reaching that outcome would not justify our running the same risk. In any event, we disagree with the dissent's reading of the Court of Appeals' opinion, and do not believe that it pursued the extraordinary course of considering this issue—which petitioner had not even *raised* in its arguments to that court—any more than we are inclined to do so. See 777 F. 2d 801, 804, 809–810 (CA1 1985). (We refrain from elaborating upon the latter point, since it is of no general application.)

Unlike *Oklahoma City* v. *Tuttle*, 471 U. S. 808 (1985), this case does not present a proper occasion for us to exercise our discretion to decide an issue despite petitioner's failure to preserve it. In *Tuttle*, the issue in question was explicitly set forth in the petition for certiorari, *id.*, at 814, n. 2, and was not objected to in respondent's brief in opposition to certiorari or in respondent's merits brief. *Id.*, at 815. In addition, the issue had been fully briefed and argued in the Court of Appeals. *Ibid.* Here, by contrast, respondent's failure to object at the petition stage is unsurprising, because the petition did not explicitly present the negligence question, and it had not been addressed below. It would be unreasonable to require a respondent on pain of waiver to object at the certiorari stage not only to the petitioner's failure to preserve the questions actually presented, but also to his failure to preserve any questions fairly included within the questions presented but uncontested earlier. Respondent strenuously objected to petitioner's raising this question at the first point that she was on notice that it was at issue in this case—in her response to petitioner's brief on the merits in No. 85–1078.

For these reasons, we have concluded that the writ should be dismissed as improvidently granted. See *Belcher* v. *Stengel*, 429 U. S. 118 (1976) *(per curiam)*.

*It is so ordered.*

JUSTICE O'CONNOR, with whom THE CHIEF JUSTICE, JUSTICE WHITE, and JUSTICE POWELL join, dissenting.

We granted certiorari in this case to resolve whether a city can be held liable under 42 U. S. C. § 1983 for providing inadequate police training, and, if so, what standard should govern the imposition of such liability. 475 U. S. 1064 (1986). In my view, the question is properly before the Court, and I would decide it on the merits.

I

On the evening of September 28, 1981, the Springfield Police Department received a telephone call reporting that

someone had called an apartment's occupants and threatened to come after them with a knife. Later calls reported that an individual identified as Clinton Thurston had broken the apartment door and assaulted a woman staying at the apartment. When officers arrived at the scene, they discovered that Thurston had abducted the woman and driven away in his car. A short while later, Thurston's vehicle was spotted by an officer driving an unmarked police car. When Thurston stopped at an intersection, the officer walked up to Thurston's vehicle and identified himself as a police officer, but Thurston drove away.

The officer gave chase, and soon was joined by other members of the Springfield Police Department. Two officers set up a roadblock to stop Thurston, but he drove past the obstacle without stopping. As he did so, one of the officers fired at the tires of Thurston's vehicle; later a nick was found in the left rear wheel. At a second roadblock, Officer Kenneth Schaub placed his vehicle across one lane of traffic, while he stood in the middle of the other lanes and attempted to flag down Thurston's automobile. Thurston again failed to stop. As Thurston passed the roadblock, Schaub fired in the direction of the car.

Officer Theodore Perry, who had been waiting near the second roadblock on his motorcycle, heard Schaub's shot and joined the chase. Accelerating past several police cars, Perry pulled abreast of the rear window on the driver's side of Thurston's car. As he did so, Thurston swerved to the left, and Perry dropped back. Rather than remain behind the vehicle, Perry twice more moved up even with the car's rear window; on both occasions, when Thurston swerved towards him, Perry fired his gun. Apparently Perry hit Thurston in the head with the second shot; the car rolled to a stop and Thurston was taken, unconscious, to the hospital, where he died a short time later.

Respondent, the administratrix of Thurston's estate, brought suit in the Federal District Court for the District of

Massachusetts under § 1983, alleging that the city and several of its police officers had deprived Thurston of his civil rights. After trial, the jury returned verdicts against the city and Officer Perry, but found in favor of the other officers. The jury awarded $1 in compensatory damages and $500 in punitive damages against Perry and $50,000 in compensatory damages against the city. The District Court denied the city's motions for directed verdict and for judgment notwithstanding the verdict. The city appealed the District Court's refusal to grant either a directed verdict or a judgment notwithstanding the verdict, and also claimed error in the jury charge.

The Court of Appeals for the First Circuit affirmed. 777 F. 2d 801 (1985). In showing that Thurston's injuries were inflicted pursuant to government "policy or custom" under *Monell* v. *New York City Dept. of Social Services*, 436 U. S. 658 (1978), respondent "argued primarily that the City should be found liable here because it had a policy or custom of inadequately training its officers." 777 F. 2d, at 803. The Court of Appeals observed that while the plurality opinion in *Oklahoma City* v. *Tuttle*, 471 U. S. 808 (1985), may "have raised doubts as to whether a harm allegedly caused by a policy of gross negligence in police training could meet § 1983's standard of causation," the Court of Appeals "continue[d] to believe [that] this is a viable theory of municipal liability." 777 F. 2d, at 804. The Court of Appeals found that while the evidence in the record regarding the Springfield Police Department's training policy admittedly was "sparse," the jury could have concluded from the testimony of two police officers that the city's training in the apprehension of fleeing vehicles was grossly inadequate. The jury also could infer, from the fact that both Schaub and Perry had used deadly force, that the city's failure to train its officers in alternative methods of stopping a fleeing vehicle played a substantial part in bringing about Thurston's death. *Id.*, at 808. The Court of Appeals identified a number of additional "policies"

or "customs" that the jury might have inferred from the evidence in this case. As the court noted, however, "these other policies were not proven sufficiently or linked sufficiently with the harm to impose municipal liability." *Id.*, at 809.

Turning to the city's challenge to the jury instructions given in the case, the Court of Appeals noted that the city's argument was that its liability "could not be predicated upon an isolated incident of negligent training, but must instead be based on 'a pattern of deliberate supervisory inaction and indifference.'" *Ibid.* The Court of Appeals concluded that while the jury instructions "could have emphasized the distinction between negligence and reckless or grossly negligent conduct," the instructions were not deficient because they did inform the jury "that it must find a failure to train which amounted to gross negligence." *Id.*, at 810.

## II

The central question presented in this case is whether a city can be held liable under § 1983 for the inadequate training of its employees. As the Court notes, fairly included is the related question whether more than simple or heightened negligence in training is required in order to establish such liability. See *ante*, at 258.[1]

The Court of Appeals clearly reached and decided the negligence question, both in its consideration of the appeal from the jury charge, and in its review of the denial of the city's motions for directed verdict and for judgment notwithstanding the verdict. First, in addressing the city's challenge to the jury instructions, the Court of Appeals specifically considered whether the jury charge should have required a

---

[1] We also granted certiorari to consider whether the "single incident" rule of *Oklahoma City* v. *Tuttle,* 471 U. S. 808 (1985), was satisfied in this case. Because, in my view, the decision below is inconsistent with *Tuttle's* requirement of proof of fault, see *infra,* at 271–272, I do not reach the question whether other aspects of *Tuttle* were satisfied in this case.

showing of "deliberate supervisory inaction and indifference." See 777 F. 2d, at 809. The Court of Appeals rejected the city's argument, concluding that the jury instructions were adequate because they "instructed the jury that it must find a failure to train which amounted to gross negligence." *Id.*, at 810. Today this Court holds that the city's challenge to the jury charge was not properly preserved on appeal because the city failed to make a timely objection to the instructions as required by Federal Rule of Civil Procedure 51. *Ante*, at 258–259. The Court of Appeals, however, did not treat the question as barred by Rule 51, perhaps because that argument was not pressed before it. See Brief for Plaintiff-Appellee in No. 85–1078 (CA1), pp. 21–24. In my view, this Court should not now decline, on that basis, to review the Court of Appeals' affirmance of the jury charge.

Moreover, even if the Court treats the city as having waived its challenge to the jury charge, the failure to object to an instruction does not render the instruction the "law of the case" for purposes of appellate review of the denial of a directed verdict or judgment notwithstanding the verdict. See *Ebker* v. *Tan Jay International, Ltd.*, 739 F. 2d 812, 825, n. 17 (CA2 1984); *Hanson* v. *Ford Motor Co.*, 278 F. 2d 586, 592–593 (CA8 1960); 9 C. Wright & A. Miller, Federal Practice and Procedure § 2558 (1971). The city raised the negligence question in its motions for directed verdict and for judgment notwithstanding the verdict, arguing that it should not be held liable "even for its grossly negligent failure to train single police officers." App. 26, 41. In arguing that a "pattern" of police misconduct is necessary to establish municipal liability under § 1983, the city relied on *Wellington* v. *Daniels*, 717 F. 2d 932 (CA4 1983), and *Languirand* v. *Hayden*, 717 F. 2d 220 (CA5 1983). In those cases, the courts required proof of a pattern of police misconduct on the ground that municipal liability under § 1983 could not be imposed absent proof of the city's "'tacit authorization' of or 'deliberate indifference' to constitutional injuries." See

*Wellington* v. *Daniels, supra,* at 936; see also *Languirand* v. *Hayden, supra,* at 226, n. 7, and 227–228.

The Court of Appeals must have viewed the city's motions as raising the negligence question, because the court directly ruled on the issue. The Court of Appeals began by stating that it previously had recognized "grossly inadequate training" as a basis for imposing municipal liability. See 777 F. 2d, at 803. The court acknowledged, however, that the decision in *Oklahoma City* v. *Tuttle,* 471 U. S. 808 (1985), had "raised doubts as to whether a harm allegedly caused by a policy of gross negligence in police training could meet § 1983's standard of causation." 777 F. 2d, at 804. The Court of Appeals then cited a footnote in *Tuttle* which states: "[I]t is open to question whether a policymaker's 'gross negligence' in establishing police training practices could establish a 'policy' that constitutes a 'moving force' behind subsequent unconstitutional conduct, *or whether a more conscious decision on the part of the policymaker would be required.*" 471 U. S., at 824, n. 7 (emphasis added). Notwithstanding the reservations expressed in *Tuttle,* the Court of Appeals "continue[d] to believe" that gross negligence in police training was "a viable theory of municipal liability" under § 1983. 777 F. 2d, at 804.

The Court does not contend that the Court of Appeals failed to pass upon the negligence question. Instead, the Court finds, from its own review of the briefs filed in the court below, that the city did not *argue* for a higher standard in the Court of Appeals. *Ante,* at 258. Certainly it is fair to conclude from the city's briefs in the Court of Appeals that its position on the question of culpability was unclear: it argued at different points that the standard should be deliberate indifference, see Brief for Defendant-Appellant in No. 85–1078 (CA1), p. 15; recklessness or "gross, palpable, and culpable" negligence, *id.,* at 8; or deliberate indifference or gross negligence, *id.,* at 13. Perhaps the Court of Appeals might have been able to conclude from this that it did not have before it the question whether municipal liability

can be based on a finding of negligence. The court did not read the briefs in that fashion, however; instead it viewed the question as before it and proceeded to consider whether gross negligence or some "more conscious decision on the part of the policymaker," *Oklahoma City* v. *Tuttle, supra,* at 824, n. 7, would be required to establish § 1983 liability. Having done so, it is clear that there are no jurisdictional or prudential reasons why this Court should not review the Court of Appeals' decision. The standard we previously have employed is that we will not review a question not pressed *or* passed on by the courts below. See, *e. g., Adickes* v. *S. H. Kress & Co.,* 398 U. S. 144, 147, n. 2 (1970); *Husty* v. *United States,* 282 U. S. 694, 702 (1931); *Duignan* v. *United States,* 274 U. S. 195, 200 (1927). Here, the Court of Appeals expressly ruled on the question, in an appropriate exercise of its appellate jurisdiction; it is therefore entirely proper in light of our precedents for the Court to reach the question on which it granted certiorari, and I would do so.

## III

In *Monell* v. *New York City Dept. of Social Services,* 436 U. S. 658 (1978), the Court held that municipal liability under § 1983 can be imposed only where the municipality itself "causes" the constitutional violation. The *Monell* Court reasoned that § 1983, as originally enacted, imposed liability if a person "subjected, or caused to be subjected," another person to the deprivation of federally protected rights. By specifically imposing liability for the torts of another person if one "caused" the tort to be committed, the statutory language suggested that Congress "did not intend § 1983 liability to attach where such causation was absent." *Id.,* at 692.

The *Monell* Court found support for this conclusion in the legislative history of the Civil Rights Act of 1871, the precursor to § 1983. The legislative history showed that Congress had rejected the "Sherman amendment," which would have imposed vicarious liability on municipalities for damage

caused by the "riotou[s] and tumultuou[s] assembl[y]" of private individuals within their borders, Cong. Globe, 42d Cong., 1st Sess., 749 (1871), on the ground that the amendment was of questionable constitutional validity. The Court determined that while the legislative history did not specifically address whether Congress intended to permit vicarious liability for the torts of municipal agents and employees, the same constitutional difficulties that Congress perceived when it rejected the Sherman amendment would apply to liability based on *respondeat superior*. The *Monell* Court concluded that Congress did not intend, in enacting § 1983, that municipalities be held vicariously liable for the tortious conduct of their employees. It is only when the "execution of [the] government's policy or custom . . . inflicts the injury" that the municipality may be held liable under § 1983. 436 U. S., at 694.

Given the importance, under § 1983, of distinguishing between direct and vicarious liability, the Court repeatedly has stressed the need to find a direct causal connection between municipal conduct and the constitutional deprivation. See, *e. g., Oklahoma City* v. *Tuttle, supra*, at 824–825, n. 8 (requiring "affirmative link" between municipal policy and constitutional violation); *Polk County* v. *Dodson*, 454 U. S. 312 (1981) (municipal policy must be "moving force" behind constitutional deprivation). In *Monell* itself, the policy at issue commanded the deprivation of constitutional rights. The causal link between the municipal policy and the constitutional violation therefore was readily apparent: no "evidence was needed other than a statement of the policy by the municipal corporation, and its exercise." *Oklahoma City* v. *Tuttle, supra*, at 822–823.

When the execution of municipal policy does not compel a constitutional violation, however, the causal connection between municipal policy and the deprivation of constitutional rights becomes more difficult to discern. In some sense, of course, almost any injury inflicted by a municipal agent or

employee ultimately can be traced to some municipal policy. Finding § 1983's causation requirement satisfied by such a remote connection, however, would eviscerate *Monell*'s distinction, based on the language and history of § 1983, between vicarious liability and liability predicated on the municipality's *own* constitutional violations. The limits on municipal liability imposed by § 1983 require more careful analysis, in each instance, of the municipal policy alleged in the case, and whether a jury reasonably could conclude that the city's conduct was the moving force in bringing about the constitutional violation.

In this case, the causal connection between the municipal policy and the constitutional violation is an inherently tenuous one. Respondent does not contend that the city's police training program *authorizes* the use of deadly force in the apprehension of fleeing vehicles; rather, her argument is that the methods taught in the city's training program were "inadequate," and that if individual officers had received more complete training, they would have resorted to those alternative methods without engaging in the unconstitutional conduct. The difficulty with respondent's argument is that at the time of the officers' alleged misconduct, any number of other factors were also in operation that were equally likely to contribute or play a predominant part in bringing about the constitutional injury: the disposition of the individual officers, the extent of their experience with similar incidents, the actions of the other officers involved, and so forth. To conclude, in a particular instance, that omissions in a municipal training program constituted the "moving force" in bringing about the officer's unconstitutional conduct, notwithstanding the large number of intervening causes also at work up to the time of the constitutional harm, appears to be largely a matter of speculation and conjecture.

Because of the remote causal connection between omissions in a police training program and affirmative misconduct by individual officers in a particular instance, in my view the

"inadequacy" of police training may serve as the basis for § 1983 liability only where the failure to train amounts to a reckless disregard for or deliberate indifference to the rights of persons within the city's domain. The "causation" requirement of § 1983 is a matter of statutory interpretation rather than of common tort law. Cf. *Martinez* v. *California*, 444 U. S. 277, 285 (1980) (injury "too remote a consequence" of official conduct to impose liability under § 1983, even if conduct "proximately caused" injury under state tort law). Analogy to traditional tort principles, however, shows that the law has been willing to trace more distant causation when there is a cognitive component to the defendant's fault than when the defendant's conduct results from simple or heightened negligence. See, *e. g.*, Restatement (Second) of Torts § 501, Comment *a*, p. 591 (1965) ("[A] jury may be permitted to find that a defendant's reckless misconduct bears a sufficient causal relation to a plaintiff's harm to make him liable, although were the defendant's conduct merely negligent, no such finding would be permissible"). See generally W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton should be permitted to find that the municipality's inadequate training "caused" the plaintiff's injury only if the inadequacy of the training amounts to deliberate indifference or reckless disregard for the consequences. Negligence in training alone is not sufficient to satisfy the causation requirement of § 1983.

A number of lower courts have recognized the need to show more than negligence before a deficient training policy can form the basis for municipal liability under § 1983, phrasing the requisite degree of fault variously as "deliberate indifference" or gross negligence "amounting to deliberate indifference." See, *e. g.*, *Fiacco* v. *Rensselaer*, 783 F. 2d 319, 326 (CA2 1986) ("deliberate indifference"); *Languirand* v. *Hayden*, 717 F. 2d, at 227 (so grossly negligent as to constitute "deliberate indifference"); *Patzner* v. *Burkett*, 779 F. 2d

1363, 1367 (CA8 1985) ("deliberate indifference" where train-
ing so grossly negligent "that police misconduct inevitably oc-
curs"); *Wellington* v. *Daniels*, 717 F. 2d, at 937, n. 6 (no
showing that municipality "remain[ed] indifferent to" unwar-
ranted injury). Indeed, the Court of Appeals for the First
Circuit previously had adopted such a standard, requiring
proof of gross negligence "amounting to deliberate indiffer-
ence" before finding *Monell* liability. See *Voutour* v. *Vitale*,
761 F. 2d 812, 820 (1985). In my view, these decisions prop-
erly reflect the need to show more than "negligence" in police
training procedures before a jury should be permitted to find
that the city's policy was a material element and substantial
factor in bringing about the alleged deprivation of protected
federal rights.

In this case, there clearly was insufficient evidence to sup-
port a finding that the city's training policy was conducted
with reckless disregard for the consequences or deliberate in-
difference to its citizens' constitutional rights. Because such
a showing is necessary, in my view, to make out a claim that
the city "subjected, or caused [Thurston] to be subjected," to
a deprivation of his constitutional rights under § 1983, the
Court of Appeals for the First Circuit should have reversed
the decision of the District Court and remanded for the entry
of judgment on behalf of the city of Springfield.

The plurality opinion in *Tuttle* made clear that to establish
municipal liability for a policy that is not itself unconstitu-
tional, the plaintiff must introduce evidence sufficient to es-
tablish the existence of the policy; evidence showing that the
city was at fault for establishing the policy; and evidence
establishing that the policy was the moving force in causing
the constitutional harm. A plaintiff does not carry the bur-
den of proving these elements merely by introducing evi-
dence concerning the particular incident at issue: "where the
policy relied upon is not itself unconstitutional, considerably
more proof than the single incident will be necessary in every
case to establish both the requisite fault on the part of the

municipality, and the causal connection between the 'policy' and the constitutional deprivation." 471 U. S., at 824 (footnotes omitted). A different result would have been directly at odds with the need under § 1983 to "prevent the imposition of municipal liability under circumstances where no wrong could be ascribed to municipal decisionmakers." *Id.*, at 821.

The Court of Appeals' analysis of "fault" in this case relies upon the kind of inference specifically rejected in *Tuttle*. The evidence introduced at trial showed that the city's officers were instructed in two techniques for apprehending fleeing suspects: they were told to stand in the street and put up their hands in a stopping motion; and to move up behind the vehicle while using lights and siren to signify that the suspect should pull over and stop. 777 F. 2d, at 807. They were taught not to set up obstacles that completely block the road. *Ibid.* The Court of Appeals did not point to any evidence which would support the conclusion that these instructions deviated from accepted police practice. Instead, the court concluded that the jury could have inferred, from the chase itself, that "partial roadblocks were not an effective method of slowing down a suspect who was unwilling to stop," *ibid.;* that additional methods might have been successful in apprehending the fleeing vehicle;[2] and that the failure to instruct

---

[2] The Court of Appeals speculated that the jury might have found three alternatives to be successful in stopping fleeing vehicles: "deploying several police cars to crowd or surround Thurston's car"; "calling in reinforcements"; or using "sheer persistence" in the hope that it "might have worn Thurston down." 777 F. 2d, at 807. The first method would not have been an accepted alternative to the use of deadly force. See International Association of Chiefs of Police, A Manual of Model Police Traffic Services, Policies and Procedures, Procedure 1.20, p. 91 (1986) ("[B]oxing in, heading off, ramming, or driving alongside the pursued vehicle . . . may be approved only when the use of deadly force would be authorized"). The second alternative, the use of reinforcements, in fact had been implemented by the city's police officers during the chase—10 officers ultimately were involved in trying to stop Thurston's vehicle. The third suggestion does not appear to be different from the city's policy of following the vehicle while using lights and siren.

in these additional methods constituted gross negligence on the part of the city.   *Ibid.*

The chain of inferences drawn by the Court of Appeals directly conflicts with *Tuttle*'s instruction that "considerably more proof than the single incident will be necessary in every case to establish . . . the requisite fault on the part of the municipality."   471 U. S., at 824.   There was no evidence in the record, apart from the speculative inferences suggested by the Court of Appeals, from which jurors reasonably could conclude that the city's training in the apprehension of fleeing vehicles manifested recklessness or deliberate indifference. Respondent therefore failed to prove an essential element of her claim, and a directed verdict should have been entered in favor of the city.   Accordingly I would reverse the Court of Appeals for the First Circuit and would remand for the entry of judgment in favor of petitioner in this case.   I respectfully dissent from the Court's judgment dismissing this case as improvidently granted.