219 F.3d 1018 (9th Cir. 2000)
 ESTATE OF MARIA TERESA MACIAS, by and through its successors in interest; CLAUDIA MACIAS; JUAN MACIAS; AVELINO MACIAS, JR., minors, by and through their Guardian, Sara Hernandez; SARA HERNANDEZ, individually, Plaintiffs-Appellants, v.
MARK IHDE, Sheriff; PAUL DAY, Sergeant; CRAIG WISEMAN, Sergeant; DEFFENBAUGH, Deputy Sheriff, Defendants, and MARK LOPEZ, Deputy Sheriff; COUNTY OF SONOMA, Defendants-Appellees.
 No. 99-15662
 
 Office of the Circuit Executive
 U.S. Court of Appeals for the Ninth Circuit
 Argued and Submitted April 26, 2000--San Francisco, California
Filed July 20, 2000
 Richard Seltzer, Seltzer & Cody, Oakland, California; Milo M. Benningfield, San Francisco, California, for the plaintiffs-appellants.
 Michael D. Senneff, Senneff Kelly, A Professional Corporation, Santa Rosa, California, for the defendants-appellees.
 Appeal from the United States District Court for the Northern District of California, D. Lowell Jensen, District Judge, Presiding; D.C. No. CV-96-03658-DLJ/MJ
 Before: Betty B. Fletcher, Arthur L. Alarcon, and Michael Daly Hawkins, Circuit Judges.
 ALARCON, Circuit Judge:
 
 
 1
 Claudia Macias, Juan Macias, Avelino Macias, Jr., Sara Hernandez and the estate of Maria Teresa Macias, (collectively, the "Appellants") appeal from the dismissal of this civil-rights action following the entry of an order granting summary judgment in favor of the County of Sonoma ("Sonoma County") and Deputy Mark Lopez of the Sonoma County Sheriff's Department (collectively, the "Appellees"). The Appellants filed this action in the district court pursuant to 42 U.S.C. S 1983, alleging that the Appellees denied Maria Teresa Macias's right to equal protection by providing her with inferior police protection on account of her status as a woman, a Latina, and a victim of domestic violence. In granting summary judgment, the district court assumed, for the purpose of considering the question whether the Appellees' conduct caused Mrs. Macias's death, that the Appellants had demonstrated in their opposition to the Appellees' motion that they, as state actors, had deprived Mrs. Macias of her constitutional rights. The Appellants have timely appealed. We have jurisdiction over the district court's final judgment pursuant to 28 U.S.C. S 1291.
 
 
 2
 The Appellants contend that reversal is compelled because the district court erred as a matter of law in ruling that the murderof Mrs. Macias was the "alleged constitutional deprivation." We reverse the order granting summary judgment and dismissing this action because we hold that the alleged constitutional deprivation was the denial of equal protection. We remand so that the district court can determine, in the first instance, following completion of discovery, whether the Appellees deprived Mrs. Macias of her right to equal protection.
 
 
 3
 * The Appellants filed this action pursuant to 42 U.S.C. S 1983, on October 18, 1996.[1] They alleged that Deputy Lopez and Sonoma County, as well as several other individuals, had violated their rights to equal protection and substantive due process. The complaint alleged that Mrs. Macias's death and Ms. Hernandez's injuries were the result of a Sonoma County policy to discriminate against women, victims of domestic violence, and Latinos. The district court dismissed the complaint on the grounds that the plaintiffs could not state a due process claim based on the criminal acts of a private citizen, and that the plaintiffs had failed to comply with the heightened pleading requirements with respect to their equal protection claims. The district court granted the plaintiffs leave to amend their equal protection claims in order to establish a non-conclusory basis for the allegations that the individual defendants intended to discriminate against women, victims of domestic violence, and Latinos.
 
 
 4
 On April 20, 1997, the Appellants filed an amended complaint. The amended complaint alleged that Deputy Lopez and Sonoma County violated Mrs. Macias's right to equal protection by providing inadequate police protection based on her status as a woman, a victim of domestic violence, and a Latina. The district court dismissed the Appellants' allegations of discrimination against Latinas, but allowed the Appellants to pursue their claims that the Appellees had discriminated against Mrs. Macias in its provisions of police protection on account of her status as a woman and a victim of domestic violence.
 
 
 5
 The district court then ordered discovery to begin in phases. The first phase was to be directed solely to the question whether the conduct of the Appellees caused the death of Mrs. Macias. The district court also instructed the parties that it would entertain "a motion for summary judgment limited to the issue of causation following the completion of discovery on the issue."
 
 
 6
 After the completion of discovery on the issue of causation, the Appellees filed a motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, limited solely to the issue of causation. The Appellees' motion focused on the question whether their conduct caused the death of Mrs. Macias. The district court stated that the only issue before it was whether the Appellants could establish "a direct causal link between the personal conduct of Deputy Lopez or the municipal conduct of Sonoma County and the alleged constitutional deprivation, in this case the murder of Maria Teresa Macias." In ruling on the question of causation, the district court assumed the existence of the other elements needed to establish a S 1983 claim, including whether Mrs. Macias had suffered a constitutional deprivation.
 
 II
 
 7
 The following facts in evidence were considered by the district court in decidingthe narrow question whether the Appellants caused Mrs. Macias's death. Mrs. Macias met Avelino Macias in Mexico in 1980. The couple married one or two years later. They subsequently settled in Sonoma County, where Mrs. Macias gained employment providing house cleaning services to local homeowners. Prior to their separation, Mr. Macias physically and sexually abused Mrs. Macias and their children. The abuse was not reported until 1995, when Mrs. Macias fled with their children to a women's shelter in Ukiah, California.
 
 
 8
 While at the shelter, Mrs. Macias filed a police report in which she alleged "aggravated physical, emotional and sexual abuse of herself and her children by her husband. " The report was prepared by the Ukiah Police Department and forwarded to the Sonoma County Sheriff's Department. Within days, Mrs. Macias filed a declaration in the Sonoma County Superior Court requesting an order to protect her and her children from any further abuse. The court issued a temporary restraining order on April 25, 1995. The court also warned Mrs. Macias that her children would be removed from her custody and placed in a foster home if she could not keep Mr. Macias away from her residence.
 
 
 9
 After obtaining the restraining order, Mrs. Macias left the shelter and returned to the family home. Sometime in the next two months, Mrs. Macias verbally recanted the allegations of abuse in her declaration in support of the temporary restraining order during a follow-up interview with the police. Mr. Macias returned to the family home, notwithstanding the warning of the Sonoma County Superior Court that the children would be placed in a foster home. On June 10, 1995, the Department of Child Protective Services of Sonoma County removed the children from Mrs. Macias's custody and placed them in the Valley of the Moon Children's Home. Soon thereafter, Mrs. Macias, with the help of her mother, Ms. Hernandez, evicted Mr. Macias from the family residence.
 
 
 10
 On January 21, 1996, the Department of Child Protective Services took Mrs. Macias's three children to her apartment for a visit. While the children were present, Mr. Macias forced his way into the home. Mrs. Macias called the Sonoma County Sheriff's Department to report the intrusion. Deputy Brad O'Bryan was dispatched to the scene. Deputy O'Bryan alleged in his declaration that the family "did not appear to be in distress or emotionally upset" when he arrived, and though Mr. Macias had forced his way into the home, he "simply walked into the room, hugged and kissed his children and then left without incident." Using the eldest child as an interpreter, Deputy O'Bryan instructed Mrs. Macias that she would have to file a complaint for criminal trespass in order to have Mr. Macias arrested. He also advised her that she could obtain another restraining order from the Sonoma County Superior Court. Mrs. Macias declined to file a complaint. Deputy O'Bryan did not file the type of report that is required by state law[2] and departmentalorders when a law enforcement agency has received a domestic violence-related call for assistance.[3]
 
 
 11
 One day later, on January 22, 1996, Mrs. Macias appeared in propria persona in the Sonoma County Superior Court. She obtained a second temporary restraining order pursuant to the California Domestic Violence Prevention Act.[4] The temporary restraining order provided that Mr. Macias "must not contact, molest, attack, strike, threaten, sexually assault, batter, telephone, or otherwise disturb" Mrs. Macias, her three children, or her mother, Ms. Hernandez. The order further provided that Mr. Macias could not come within 100 yards of Mrs. Macias, her apartment, her places of employment, or her vehicle, and that the order "shall be enforced by all law enforcement officers in the State of California."
 
 
 12
 The next day, Mr. Macias followed Mrs. Macias to a home in Glen Ellen, California, where she provided house cleaning services. He entered the garage. Mrs. Macias sought assistance from her employer. The employer instructed Mr. Macias to leave the premises, whereupon Mr. Macias became "menacing" and threatened to report her and Mrs. Macias to the Immigration and Naturalization Service. While Mr. Macias was present, Mrs. Macias contacted the Sonoma County Sheriff's Department to advise it of the ongoing incident. The Sonoma County Sheriff's Department dispatched Deputy Ronald Hansen to the scene. Deputy Hansen, however, could not find the residence, which was located on a dirt road approximately one-half mile from the main road. He ultimately gave up his search. A dispatcher left a message on the homeowner's answering machine advising Mrs. Macias that Deputy Hansen was lost.
 
 
 13
 Later that same day, Mrs. Macias visited a friend, Marty Cabello, at the apartment complex where Mr. Macias was then living. Mrs. Macias parked her car in the apartment complex's parking lot. Mr. Macias subsequently returned home, parked his vehicle behind Mrs. Macias's vehicle, and went upstairs to his own apartment. Ms. Cabello testified in her deposition that she called the Sonoma County Sheriff's Department to report that Mr. Macias had blocked Mrs. Macias's car and that he wasrefusing to permit her to leave the apartment complex.
 
 
 14
 The Sonoma County Sheriff's Department dispatched Deputy Kevin Mullnix and Deputy O'Bryan to the scene. After Mrs. Macias advised them that she had obtained a temporary restraining order against Mr. Macias, the deputies discovered that the order had not been served on Mr. Macias, and that the paperwork for service was located at the Sonoma County Sheriff's Department. Nevertheless, Deputy Mullnix and Deputy O'Bryan went to Mr. Macias's apartment and ordered him to move his vehicle. The deputies informed Mr. Macias of the temporary restraining order, and Mr. Macias agreed to stop by the Sonoma County Sheriff's Department later to have the order properly served upon him. The deputies then left the scene.
 
 
 15
 Within twenty minutes of their departure from Mr. Macias's apartment, however, Deputy Mullnix and Deputy O'Bryan were once again dispatched to the apartment complex. The dispatcher advised the deputies that Mr. Macias had still not moved his vehicle. When they arrived, Deputy Mullnix returned to Mr. Macias's apartment, and accompanied him to the parking lot. Deputy Mullnix declined to arrest Mr. Macias, however, because he had not been served with the temporary restraining order.
 
 
 16
 The evidence submitted by the parties in the summary judgment proceeding differs as to whether the deputies believed that Mrs. Macias was frightened or in danger when they returned to the apartment complex. Ms. Cabello testified in her deposition that Mrs. Macias looked "petrified," and that she informed the deputies that Mr. Macias had threatened to kill Mrs. Macias. Deputy O'Bryan, however, asserted in a declaration that Mrs. Macias did not "appear upset." Deputy Mullnix stated in his declaration that Mrs. Macias's voluntary decision to visit the apartment complex where Mr. Macias resided led him to believe that Mrs. Macias "did not feel she was in any danger." The officers did not file a report concerning this event.
 
 
 17
 On January 29, 1996, roughly six days after the incidents at the Glen Ellen residence and the apartment complex, Mr. Macias was served with the temporary restraining order. Two days later, Mrs. Macias contacted the Sonoma County Sheriff's Department to report that Mr. Macias had violated its provisions. The dispatcher sent Deputy Lopez to Mrs. Macias's apartment to take the complaint. Mrs. Macias informed him that Mr. Macias had attempted to contact her by telephone, and that Mr. Macias had been seen around her apartment. Deputy Lopez advised Mrs. Macias that the area where Mr. Macias had been seen was outside the zone of protection afforded by the temporary restraining order. Mrs. Macias responded that she still wished to file a complaint for the telephone call. In her deposition, Monica Armstrong, Mrs. Macias's roommate, testified that Deputy Lopez appeared hurried, and that he did not write anything down.
 
 
 18
 Pursuant to Mrs. Macias's request, Deputy Lopez prepared a report, which he forwarded to the Sonoma County District Attorney's Office. He also telephoned Mr. Macias to advise him to stay away from Mrs. Macias. The deputy district attorney who reviewed the report declined to prosecute Mr. Macias.
 
 
 19
 On February 15, 1996, Mrs. Macias and Mr. Macias appeared before the Sonoma County Superior Court for a hearing concerning an extension of the temporary restraining order. The court extended the restraining order for an additional year. The restraining order was signed on February 28, 1996. It was filed with the court clerk on March 4, 1996. No one delivered the March 4, 1996 order to the Sonoma County Sheriff's Department.
 
 
 20
 On February 20, 1996, Susan Levi, the Department of Child Protective Services employee assigned to counsel Mrs. Macias and Mr. Macias, telephoned the SonomaCounty Sheriff's Department and spoke to an unidentified person to express concern that Mr. Macias was stalking and harassing Mrs. Macias. In the conversation, Ms. Levi explained that she was counseling Mrs. Macias and Mr. Macias, that Mrs. Macias had described four different incidents that had occurred within a three-day period, and that Mrs. Macias had obtained a one-year extension of the temporary restraining order. Ms. Levi further reported that she was concerned that Mr. Macias was "showing up everywhere." In response, the person with whom she spoke informed her that Mrs. Macias would need to provide detailed written documentation of each event to support a claim for stalking. Ms. Levi conveyed the information to Mrs. Macias, who then began to take notes of her encounters with Mr. Macias.
 
 
 21
 The next day, on February 21, 1996, Mrs. Macias and Ms. Cabello went to the Sonoma County Sheriff's Department to complain about an additional incident of stalking involving Mr. Macias. The two spoke with Deputy Daniel Deffenbaugh. Ms. Cabello informed Deputy Deffenbaugh that Mr. Macias was "threatening to kill" Mrs. Macias, that "he was following her more than he had ever followed her," and that Mrs. Macias "had a restraining order." Ms. Cabello testified that Deputy Deffenbaugh told the two women that the Sonoma County Sheriff's Department could not arrest Mr. Macias unless the officers "catch him doing this." Ms. Cabello replied that it would be easy to catch Mr. Macias, because he had waited for Mrs. Macias every night in the parking lot of the night school where Mrs. Macias attended English classes. She also stated that Mr. Macias had left flowers and a card addressed to Mrs. Macias on the steps of the night school on Valentine's Day, and that she and Mrs. Macias had seen Mr. Macias at their church earlier in the day.
 
 
 22
 Deputy Deffenbaugh informed Mrs. Macias that the church was outside of the jurisdiction of the Sonoma Country Sheriff's Department and encouraged her to report the Valentine's Day incident to the Sonoma Police Department. Deputy. Deffenbaugh prepared a report recommending charges against Mr. Macias for violating the terms of the temporary restraining order on Valentine's Day. He also instructed Mrs. Macias to document subsequent stalking incidents on forms which he provided her, and to deliver her personal reports to the Sonoma County Sheriff's Department every few days.
 
 
 23
 Deputy Deffenbaugh's report did not indicate that Mr. Macias had threatened to kill or injure Mrs. Macias. In his declaration, Deputy Deffenbaugh asserts that he was not informed that Mr. Macias had made any threats against Mrs. Macias. The report was forwarded to the Sonoma County District Attorney's Office. That agency declined to prosecute Mr. Macias. The deputy district attorney who acted on the report testified that it lacked proof that Mr. Macias had been served with a temporary restraining order and provided insufficient evidence of harassment.
 
 
 24
 Two days later, on February 23, 1996, Mrs. Macias walked into a substation of the Sonoma County Sheriff's Department to submit additional reports on the forms that Deputy Deffenbaugh had given her. Mrs. Macias informed Deputy Lopez that Mr. Macias had approached her at the Boyes Springs Food Center, and that he had also attempted to contact her by telephone. She provided Deputy Lopez with two written narrative accounts of these events. Deputy Lopez informed her that he would submit a supplemental report to the Sonoma County District Attorney's Office. Mrs. Macias then left the substation.
 
 
 25
 After Mrs. Macias arrived home, she received another telephone call from Mr. Macias. She then called the Sonoma County Sheriff's Department to report a new violation of the temporary restraining order. The dispatcher relayed the information to Deputy Lopez, who was then responding to a reported burglary. Deputy Lopez told the dispatcher, "I can't keepfiling a report every time she calls." Deputy Lopez visited Mrs. Macias later that evening and asked her to keep a log of Mr. Macias's telephone calls.
 
 
 26
 After visiting Mrs. Macias, Deputy Lopez telephoned Mr. Macias and questioned him about the allegations of stalking and harassment. In his conversation with Deputy Lopez, Mr. Macias denied all of Mrs. Macias's allegations of stalking and harassment. Deputy Lopez responded by stating that the Sonoma County Sheriff's Department had received three complaints concerning his harassment and stalking, and that "it would be in his interest to stay away from[Mrs. Macias], because there are witnesses that are corroborating her story." Deputy Lopez submitted a supplemental report to the Sonoma County District Attorney's Office recommending that it "possibly consider filing charges" after reviewing all of the facts.
 
 
 27
 On February 28, 1996, Mr. Macias followed Mrs. Macias to another residence where she provided house cleaning services. Mrs. Macias flagged down Deputy Hansen, and told him that her husband was following her. Deputy Hansen found Mr. Macias sitting in a parked vehicle close to the residence and approached him. In his deposition, Deputy Hansen testified as follows:
 
 
 28
 I was told that there was a neighbor or a person that lived in the area calling, stating that there was some type of disturbance going on down the street from them and it was a male and a female, and I went to the area. Initially when I got there I didn't see any body in the street, the best I can remember. And I believe I circled around and came back and then I was met by Mrs. Macias. I didn't know her at the time, didn't know her name. And the best I can recall is she told me she had a problem between her and her husband. There was a language barrier and I said okay, and I told her I'll check the area, see if I can find him . . . I confronted him, I told him to the effect that, you know, leave your wife alone. She said you had a problem, leave her alone. There was no confrontation between me and him. Best I can recall, you know, he was polite.
 
 
 29
 Deputy Hansen was never told of the existence of the restraining order; nor did he ask Mr. Macias or Mrs. Macias for their names.
 
 
 30
 On March 1, 1996, Mrs. Macias called the Sonoma County Sheriff's Department to report that Mr. Macias had approached Ms. Hernandez while she was waiting for Mrs. Macias to leave Ms. Cabello's apartment. The apartment was located in the same complex where Mr. Macias had resided when he blocked Mrs. Macias's car on January 23, 1996.[5] Monica Armstrong, acting as Mrs. Macias's interpreter, informed the dispatcher that it was not the first time that Mr. Macias had violated the restraining order. The dispatcher advised Ms. Armstrong that the Sonoma County Sheriff's Department would send a deputy to meet with Mrs. Macias. The department's incident report states that Mrs. Macias never appeared at the substation.
 
 
 31
 Over the course of the next week, Ms. Cabello made two additional calls to the Sonoma County Sheriff's Department on Mrs. Macias's behalf. In the first call, Ms. Cabello explained that Mr. Macias had followed Mrs. Macias to another employer's home, opened a sliding glass door, and entered the residence. In the second call, Ms. Cabello advised the department that Mr. Macias had followed Mrs. Macias to two more homes, and that he was found sitting in front of Mrs. Macias's house. Ms. Cabello testified that the deputy with whom she spoke stated Mrs. Macias "was under psychiatric care," and that he thought she was putting too much emphasis on Mr. Macias's actions. Ms. Cabellodid not know the name of this deputy. The deputy further advised Ms. Cabello that Mrs. Macias should document any incidents involving Mr. Macias and submit them to the Sonoma County Sheriff's Department.
 
 
 32
 On March 18, 1996, Mrs. Macias telephoned the Sonoma County Sheriff's Department. According to the dispatch records, Mrs. Macias reported that Mr. Macias had once again attempted to contact her by telephone, and that she had hung up the receiver after hearing his voice. The dispatcher, who spoke to Mrs. Macias through an interpreter, asked whether Mr. Macias had been violent in the past. Mrs. Macias responded, "Mucho," which the interpreter translated as meaning "much, very much." The dispatcher informed Mrs. Macias that the Sonoma County Sheriff's Department would send a deputy to meet with her, and that she should call 911 if Mr. Macias came to her apartment. According to the department's dispatch records, Deputy Mullnix reported to Mrs. Macias's home. Deputy Mullnix, however, testified in his declaration that he did not have any "contact with anyone concerning the Macias family" on that date. Mrs. Macias did not directly contact the Sonoma County Sheriff's Department after March 18, 1996.
 
 
 33
 On March 27, 1996, Mr. Macias followed Mrs. Macias and Ms. Hernandez as they drove to an appointment with the Department of Child Protective Services in Santa Rosa, California. Frightened for their safety, they went to the Santa Rosa Police Department to seek help. They spoke with Officer Ronald Perez. Officer Perez requested that Ms. Levi come to the police station to serve as an interpreter. Mrs. Macias provided Officer Perez with copies of the temporary restraining order and her declaration detailing previous sexual assaults. She also advised him that Mr. Macias had been stalking and harassing her. In his deposition, Officer Perez stated that he "felt there was probable cause for a violation, and that [he] was going to take [Mr. Macias] into custody. " He did not arrest Mr. Macias, however, because Ms. Levi indicated that she needed to speak to Mr. Macias during the counseling session. Mrs. Macias also informed him that she did not want to have Mr. Macias arrested and taken into custody at the time. Rather, she stated that she wanted a report forwarded to the Sonoma County District Attorney's Office.
 
 
 34
 On April 15, 1996, Mr. Macias appeared at the residence of one of Mrs. Macias's employers, where he shot Mrs. Macias and her mother, Ms. Hernandez, before turning the weapon on himself. Officers of the Sonoma Police Department were dispatched to the crime scene. When they arrived, Mrs. Macias and Mr. Macias were dead, and Ms. Hernandez was suffering from a gunshot wound. At the crime scene, the police recovered two spiral notebooks in which Mrs. Macias had documented Mr. Macias's continued abuse, as instructed by the Sonoma County Sheriff's Department. They also found two audio cassette tapes that contained threatening telephone messages that Mr. Macias had left on Mrs. Macias's answering machine.
 
 III
 
 35
 The Appellants contend that the district court "fundamentally misconstrued" the constitutional deprivation at issue in this case. They maintain that the alleged constitutional deprivation occurred when the defendants failed to provide Mrs. Macias with equal police protection in the months leading up to her death. Their brief states:
 
 
 36
 The district court erred in determining that there was insufficient evidence of actual causation in part, by misconstruing [the Appellants'] constitutional injury as `murder' rather than `lack of equal protection.' By so doing, the court ignored the evidence that [the Appellees'] arbitrary failure to enforce the law caused [Mrs. Macias] to suffer not only her murder on April 15, 1996, but thethree months of harassment, stalking, and death threats that proceeded it.
 
 
 37
 Appellants Br. at 31.
 
 
 38
 This argument raises two questions. Did the district court err in concluding that the alleged constitutional deprivation was the murder of Mrs. Macias? Did the district court err in dismissing the action without affording the Appellees the opportunity to demonstrate, after conducting discovery, that they are entitled to a trial regarding whether Deputy Lopez and Sonoma County deprived Mrs. Macias of her right to equal protection? We review de novo a district court's decision to grant a motion for summary judgment. See Balint v. Carson City, 180 F.3d 1047, 1050 (9th Cir. 1999) (en banc).
 
 
 39
 In its order granting the Appellees' motion for summary judgment, the district court began its analysis by setting forth the elements of a S 1983 claim against an individual state actor as follows:
 
 
 40
 (1) [the plaintiff] possessed a constitutional right of which she was deprived;
 
 
 41
 (2) the acts or omissions of the defendant were intentional;
 
 
 42
 (3) the defendant acted under color of law; and
 
 
 43
 (4) the acts or omissions of the defendant caused the constitutional deprivation.
 
 
 44
 Estate of Macias v. Lopez, 42 F. Supp.2d 957, 962 (N.D. Cal. 1999) (emphasis added). The court also stated that, to establish municipal liability, a plaintiff must show that
 
 
 45
 (1) [the plaintiff] possessed a constitutional right of which she was deprived;
 
 
 46
 (2) the municipality had a policy or custom;
 
 
 47
 (3) this policy or custom amounts to deliberate indifference to [the plaintiff's] constitutional right; and
 
 
 48
 (4) the policy or custom caused the constitutional deprivation.
 
 
 49
 Id. (emphasis added). The district court followed its summary of the elements of a S 1983 claim with the following comment:
 
 
 50
 At this stage in the litigation, the Court is only con fronted with the sufficiency of plaintiff's showing as to the fourth element in each of plaintiff's section 1983 claims; the element of causation. See Order of Oct. 31, 1997. For the purposes of this Order, there fore, the Court assumes without deciding that the other elements needed to establish a section 1983 violation exist.
 
 
 51
 Id. at 962-63. Thus, the district court assumed, without actually deciding that Mrs. Macias was deprived of her federal constitutional right to the equal protection of the laws. The district court then stated, however, that "[b]efore there can be any liability under section 1983, there must be`a direct causal link' between the personal conduct of Deputy Lopez or the municipal conduct of Sonoma County and the alleged constitutional deprivation, in this case the murder of Maria Tersesa Macias on April 15, 1996." Id. at 963 (emphasis added).
 
 
 52
 In support of its conclusion that the alleged constitutional deprivation was the death of Mrs. Macias, the district court cited the Supreme Court's opinions in Monell v. Department of Social Servs, 436 U.S. 658 (1978), and City of Canton v. Harris, 489 U.S. 378 (1989), the dissenting opinion of Justice O'Connor in City of Springfield v. Kibbe, 480 U.S. 257, 260 (1987), and this court's opinion in Harris v. City of Roseburg, 664 F.2d 1121, (9th Cir. 1981). In each of those cases, the Supreme Court and this court treated the deprivation of a constitutional right as the alleged "injury." See Monell, 436 U.S. at 692 (holding that S 1983 "plainly imposes liability on a government that, under color of some official policy, `causes' an employee to violate another's constitutional rights"); Harris, 489 U.S. at 385 (stating that "our first inquiry in any case alleging municipalliability under S 1983 is the question whether there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation"); Kibbe, 480 U.S. at 267 (stating that "the Court repeatedly has stressed the need to find a direct causal connection between municipal conduct and the constitutional deprivation") (O'Connor, J., dissenting); Harris, 664 F.2d at 1125 (holding that "[l]iability under S 1983 can be established by showing that the defendants either personally participated in a deprivation of the plaintiff's rights, or caused such a deprivation to occur") (footnote omitted). Neither court has used the term "injury" to refer to the compensable harm that may have been caused by the alleged constitutional deprivation.
 
 
 53
 We agree with the Appellants that the district court erred as a matter of law in concluding that the alleged constitutional deprivation was the murder of Mrs. Macias. It is well established that "there is no constitutional right to be protected by the state against being murdered by criminals or madmen." Bowers v. DeVito, 686 F.2d 616, 618 (7th Cir. 1982). There is a constitutional right, however, to have police services administered in a nondiscriminatory manner -a right that is violated when a state actor denies such protection to disfavored persons. See Navarro v. Block, 72 F.3d 712, 715-17 (9th Cir. 1996) (recognizing a cause of action under S 1983 based upon the discriminatory denial of police services); Balistreri v. Pacifica Police Dep't, 901 F.2d 696, 70001 (9th Cir. 1990) (same); see also Penrod v. Zavaras, 94 F.3d 1399, 1406 (10th Cir. 1996) (stating that "[a]n equal protection violation occurs when the government treats someone differently [from] another who is similarly situated") (citing Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 439 (1985)). The alleged constitutional deprivation in this matter was the alleged denial of equal police protection to Mrs. Macias.
 
 
 54
 While the question considered by the district court may have some relevance to the amount of damages that the Appellants are entitled to recover, it has no effect on the issue whether they can demonstrate that the Appellees' conduct could support a cause of action under S 1983. A plaintiff may prove a violation of S 1983 without demonstrating that the deprivation of his or her constitutional rights caused any actual harm. See George v. City of Long Beach , 973 F.2d 706, 708 (9th Cir. 1992). "In this Circuit, nominal damages must be awarded if a plaintiff proves a violation of his[or her] constitutional rights." Id. The trier of fact must award nominal damages to the plaintiff "as a symbolic vindication of her constitutional right." Floyd v. Laws, 929 F.2d 1390, 1403 (9th Cir. 1991). Thus, the Appellants may prevail on their claim and receive at least nominal damages if they can prove that the Appellees violated Mrs. Macias's right to equal protection, irrespective of whether the Appellees' conduct caused Mrs. Macias's death.
 
 
 55
 Because the district court expressly limited discovery, and the question to be decided on summary judgment, to whether the Appellees' conduct caused the death of Mrs. Macias, it did not decide whether the Appellants can demonstrate that the Appellees deprived Mrs. Macias of her right to equal protection. It therefore erred in dismissing this action.
 
 CONCLUSION
 
 56
 The district court erred in concluding that the alleged constitutional deprivation was the murder of Mrs. Macias. The district court also erred in dismissing the action without determining whether the Appellees' conduct deprived Mrs. Macias of her right to equal protection. Accordingly, we REVERSE the order granting summary judgment and dismissing this action, and REMAND with instructions that the parties be afforded the opportunity to conduct discovery on the alleged constitutionaldeprivation, and to file any appropriate pretrial motions.
 
 
 
 Notes:
 
 
 [1]
 Section 1983 provides, in pertinent part:
 Every person who, under color of any statute, ordinance, regula tion, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .
 42 U.S.C. S 1983.
 
 
 [2]
 Section 13730 of the California Penal Code states, in relevant part:
 (a) Each law enforcement agency shall develop a system, by January 1, 1986, for recording all domestic violence-related calls for assistance made to the department including whether weapons are involved. All domestic violence related calls for assistance shall be supported with a written incident report, as described in subdivision (c), identifying the domestic violence incident.
 * * *
 (c) Each law enforcement agency shall develop an incident report form that includes a domestic violence identification code by January 1, 1986. In all incidents of domestic violence, a report shall be written and shall be identified on the face of the report as a domestic violence incident. A report shall include at least both of the following:
 (1) A notation of whether the officer or officers who responded to the domestic violence call observed any signs that the alleged abuser was under the influence of alcohol or a controlled substance.
 (2) A notation of whether the officer or officers who responded to the domestic violence call determined if any law enforcement agency had previously responded to a domestic violence call at the same address involv ing the same alleged abuser or victim.
 Id. (1999).
 
 
 [3]
 The departmental orders of the Sonoma County Sheriff's Department state, in relevant part:
 a. Deputies shall attempt to identify all domestic violence inci dents they come into contact with whether dispatched or observed. From the outset of all such incidents or dispatches, deputies will be aware that they are required by Penal Code Section 13730 to write an incident report. Per P.C. 13730 that report must be identifiable on its face as a domestic violence incident report. Deputies shall write the words "Domestic Violence" in the classification section of the report form.
 * * *
 g. Deputies will write a report in all incidents of domestic violence. Penal Code 13730 requires such a report shall be identified on its face as a domestic violence incident and that it shall be retrievable.
 Sonoma County Sheriff's Department, Departmental General Orders, D-2(D)(2) (emphasis in original).
 
 
 [4]
 Section 6320 of the California Family Code states, in relevant part:
 The court may issue an ex parte order enjoining a party from molesting, attacking, striking, stalking, threatening, sexually assaulting, battering, harassing, telephoning, including, but not limited to, annoying telephone calls as described in Section 653m of the Penal Code, destroying personal property, contacting, either directly or indirectly, by mail or otherwise, coming within a specified distance of, or disturbing the peace of the other party, and, in the discretion of the court, on a showing of good cause, of other named family or household members.
 Id. (1999).
 
 
 [5]
 The record does not indicate whether Mr. Macias lived at that apartment complex on March 1, 1996.